498 S.E.2d 869

**In the Matter of Sharon G. MARSHALL, Respondent.**

**No. 24775.**

Supreme Court of South Carolina.

Heard Jan. 21, 1998.
Decided March 23, 1998.

---

516

J. Cordell Maddox, Jr., of Glenn, Haigler & Maddox, Anderson, for respondent.

Attorney General Charles M. Condon and Assistant Deputy Attorney General J. Emory Smith, Jr., Columbia, for Complainant.

PER CURIAM:

In this attorney disciplinary matter, respondent, Sharon G. Marshall, is charged with several acts of misconduct arising out of her representation of her clients and her supervision of her employee. We find respondent committed misconduct and impose a definite suspension from the practice of law for a period of six months. In addition, respondent must complete the Law Office Management Assistance Program (LOMAP) of the South Carolina Bar and make restitution prior to reinstatement.

## PROCEDURAL BACKGROUND

This disciplinary matter concerns six complaints filed against respondent between May 1995 and May 1996. The complaints alleged ten separate matters in which respondent was charged with misconduct.[1] A hearing was held on June 18, 19, and 20, 1996. Respondent was represented by counsel. On April 12, 1997, the Hearing Panel (Panel) issued its report finding misconduct and recommending a definite suspension for one year. Both respondent and Complainant filed exceptions to this report. The Interim Review Committee[2]

---

1. The Third Supplemental Complaint was abandoned by Complainant prior to the hearing because the witnesses were unable to attend the hearing. The Panel made no findings concerning the allegations made in the Fifth Supplemental Complaint, and neither party has excepted to the Panel's lack of findings on this matter.

2. The order adopting the new Rules for Lawyer Disciplinary Enforcement provided that any disciplinary case in which a hearing had been held by a hearing panel prior to January 1, 1997, would continue to

of the Board of Commissioners on Grievances and Discipline (Committee) agreed with the Panel's findings of fact and conclusions of law. In addition to recommending a one year suspension, the Committee recommended respondent provide restitution to the victims and complete the LOMAP of the South Carolina Bar prior to reinstatement. Both respondent and Complainant filed exceptions and briefs with this Court. Complainant claims the Panel and Committee erred in not finding respondent was directly involved in several schemes to defraud her clients. Respondent argues, because the Panel concluded she was not involved in these schemes to defraud her clients, the recommended sanction of one year suspension is too harsh.

## DISCIPLINARY VIOLATIONS

Although this Court is not bound by the findings of the Panel and Committee, these findings are entitled to great weight, particularly when the inferences to be drawn from the testimony depend on the credibility of the witnesses. *Matter of Yarborough,* 327 S.C. 161, 488 S.E.2d 871 (1997). However, this Court may make its own findings of fact and conclusions of law. *Id.* Further, a disciplinary violation must be proven by clear and convincing evidence. *Id.*

In 1991, respondent hired Miriam Durham, whom she had known since childhood, to manage her office and to be a paralegal. Ms. Durham had previously worked for several other attorneys and respondent contacted one of these attorneys who gave Ms. Durham a good reference.

Respondent's office staff was controlled by Ms. Durham. Ms. Durham directed all of respondent's appointment making, telephone calls and mail to herself. Respondent erroneously believed the office procedure was for mail to be brought to the receptionist's desk and then to respondent. After Ms. Durham's departure in April 1994, many documents were found in

---

conclusion under the former Rule on Disciplinary Procedure. The Interim Review Committee was created to fulfill the functions performed by the Executive Committee under Paragraph 14(a) of the former Rule on Disciplinary Procedure in those cases. Rule 413, SCACR.

her office, including original letters regarding some of the matters involved in this proceeding.

Respondent was often out of the office. She was the juvenile public defender for Anderson County and was required to be in court each Wednesday and, usually, additional mornings or afternoons each week.

From 1991 to 1994, respondent delegated to Ms. Durham unsupervised and unfettered authority within her office, including control over the day to day financial affairs. Although respondent's bookkeeping was handled by an outside company, Triple A Bookkeeping, Ms. Durham usually dealt with Triple A. All of respondent's bank statements were sent directly to Triple A and respondent rarely, if ever, closely reviewed these statements. Eventually, Ms. Durham caused respondent to terminate her relationship with Triple A. Ms. Durham then handled the bookkeeping.

In April 1994, respondent changed the office locks after a telephone conversation with another attorney regarding Ms. Durham's misrepresentation of her identity at a local jewelry store. On the day the locks were changed, respondent did not confront Ms. Durham about the misrepresentation or about the changing of the locks. Ms. Durham left that same day and never returned.

After Ms. Durham ended her employment, "clients" came to respondent inquiring about their cases. Respondent had not previously met many of these "clients." These persons brought receipts which respondent had never seen and checks which had been forged by Ms. Durham. Respondent did attempt to help several of these people or to reimburse them for the money they paid to Ms. Durham. In 1995, respondent was diagnosed with cancer and has since undergone treatment.

Ms. Durham had a criminal record in Anderson County for fraudulent checks prior to 1991. Ms. Durham's ex-husband testified he thought respondent had represented Ms. Durham in a criminal proceeding prior to hiring her. Respondent denied ever representing Ms. Durham and denied any knowledge of Ms. Durham's past criminal record for fraudulent checks. Respondent admitted she was aware Ms. Durham had credit problems. A colleague of respondent expressed

concerns to respondent about Ms. Durham's character shortly after respondent hired Ms. Durham. Respondent dismissed these concerns because Ms. Durham was doing a great job running the office and because she attributed the concerns to a personality conflict between the colleague and Ms. Durham. Further, this colleague testified her concerns partially arose out of her envy that respondent had found such a hard working employee. Respondent's brother also attempted to warn respondent in 1992 that Ms. Durham could not be trusted. Respondent's brother had entrusted respondent with a large sum of money. Respondent placed a portion of this money in her trust account and the rest she held as cash in a box at her office. Supposedly, respondent would hold this money for her brother and as he needed it, she would disburse it. Respondent's brother refused to believe the accuracy of the accounting provided to him by respondent and Ms. Durham of the disbursement of his funds; instead, he accused Ms. Durham of stealing the money. Respondent refused to believe Ms. Durham had stolen this money. Respondent testified her brother was irresponsible with money.

Ms. Durham testified during this hearing. The Panel's report did not address her testimony. We conclude her testimony is completely incredible.

### Provident Matter

Beginning in 1989, respondent represented a client on a social security disability claim. The client received an award of $12,530.10. Respondent was owed 25% of this award for attorney fees.

After receiving her disability award in May 1992, the client was required to reimburse Provident Insurance Company (Provident) for monies provided by Provident to the client before her disability award. Ms. Durham informed the client she would be required to repay Provident $12,530.10 in a lump sum. The client brought Ms. Durham a check for this amount. This check was deposited into respondent's trust account on August 8, 1992. Ms. Durham also instructed the client to cash another check for $949.67 and to bring the cash back to Ms. Durham. Ms. Durham assured the client she would send these monies to Provident as repayment but she

never did. On August 28, 1992, the client gave Ms. Durham another check for $3,798.68. Ms. Durham told the client this check would also be part of the repayment to Provident. This check was deposited into respondent's trust account. Ms. Durham received from the client a total of $17,278.35.

The client then received a letter from an employee of Provident stating that Provident's overpayment to the client was $9,991.53. This amount was calculated based on the amount of the award minus the attorney fees. Provident asked the client to forward a check or money order for that amount. Because the client thought she had repaid Provident, the client contacted Ms. Durham to inquire about the letter. Ms. Durham claimed she was working on the matter and she told the client not to speak with any employees of Provident. The client then received another letter from Provident asking for repayment.

The client scheduled an appointment with respondent to discuss this matter. However, shortly before her appointment, Ms. Durham canceled the appointment. The client never talked directly to respondent about the problems arising from the Provident matter.

The client never owed Provident more than $9,991.53. Checks were written to respondent from the trust account for "[the client] SS" on August 28, 1992 in the amount of $1,200.00 and on August 31, 1992 in the amount of $2,000.00. The signatures on these checks were made by a signature stamp. Respondent testified she had authorized Ms. Durham to use this stamp in emergencies. These checks were deposited into respondent's operating account. By September 30, 1992, the trust account balance into which $15,828.78 had been deposited was $239.00. None of the missing monies were ever paid to Provident. However, from April 1993 to March 1994, respondent paid Provident $1200.00 on behalf of the client. Respondent testified in 1993 Ms. Durham told her the client could not repay Provident in a lump sum. Thus, respondent contacted Provident on behalf of the client, and Provident agreed to accept monthly payments of $200.00. Respondent conveyed this information to Ms. Durham who was to inform the client of the arrangement. Afterwards, when Ms. Durham would

inform respondent the client had paid $200.00, respondent would send Provident a check for that amount.

In the fall of 1994, after the client became aware Ms. Durham had left respondent's office by seeing Ms. Durham's picture on the television show "American's Most Wanted," the client contacted respondent and told her about her experiences with Ms. Durham. Respondent was receptive to the client's information. The client asked respondent to repay her for the money Ms. Durham had taken. At that time, respondent indicated perhaps she could help the client with her repayment to Provident. However, because respondent received a grievance notice concerning this matter shortly after this conversation, respondent did not contact the client again. After Ms. Durham's departure in April 1994, respondent discovered several documents regarding the Provident matter in Ms. Durham's office. Respondent had not previously seen these documents.

At the time of the hearing, Provident was drafting $60.00 each month from the client's social security check of $300.00, leaving the client with $240.00 per month.

■ The Panel concluded respondent, through her failure to supervise Ms. Durham, violated Rule 407, SCACR, Rule 1.15 by failing to promptly deliver to the client funds she was entitled to receive, and by failing to promptly render a full accounting to the client. In addition, the Panel found respondent, through failure to supervise Ms. Durham, violated Rule 407, SCACR, Rule 1.3 by failing to act with reasonable diligence in representing this client during the time the client's financial matters were being handled by respondent's office. Further, respondent, through her failure to supervise Ms. Durham, failed to keep the client reasonably informed about the status of her payments to Provident and respondent failed to supervise her office staff to ensure the client's requests for information would receive a reasonable response. Rule 407, SCACR, Rule 1.4(a). Moreover, the Panel concluded respondent's failure to adequately supervise Ms. Durham violated Rule 407, SCACR, Rule 5.3. Finally, the Panel found respondent's failure to supervise the operations of her office demonstrated a current lack of professional competence in the

practice of law in violation of Rule 407, SCACR, Rule 1.1 and Rule 413, SCACR, ¶ 5(E).

We agree with the Panel's findings. If respondent had properly supervised and monitored her office and her bank statements, respondent could have at least mitigated the damage caused by Ms. Durham. With proper supervision, respondent may have been able to prevent Ms. Durham's activities.

## Inter–Serve Matters

Inter–Serve is a company which loans money at very high interest rates to persons with pending personal injury lawsuits. The person obtaining the loan agrees to repay the loan plus interest when he recovers on his lawsuit.

In 1991, Don King, the owner of Inter–Serve, informed respondent of this business for the purpose of obtaining respondent's agreement to refer clients to his business. Mr. King left pamphlets with Ms. Durham. Thereafter, respondent's firm began to refer clients to Inter–Serve.

Mr. King met with respondent in August 1992 concerning the status of her clients' lawsuits. Mr. King was unsure if Ms. Durham was also present at this meeting. Mr. King claims he discussed the cases of Michelle Patterson, Russell Fair, Lawrence Fair and a Marian Durham[3] with respondent and respondent verified all these cases were outstanding. However, respondent denies having a discussion about these particular loans. Instead, she claims the meeting was very general and no specific cases were discussed. Mr. King testified he mailed respondent a list of the outstanding loans.

During this time, Ms. Durham was screening respondent's mail; therefore, it is possible respondent never received this list. Further, none of the paperwork concerning these loans was signed by respondent. Instead, Ms. Durham signed all the necessary documents and was the one who usually dealt with Inter–Serve.

---

3. The name Marian was probably an alias used by Ms. Durham.

## Ms. Durham's Relatives

Michelle Patterson was the fiancée of Russell Fair, Ms. Durham's son, and is the mother of Ms. Durham's grandchild. At the direction of Ms. Durham, Ms. Patterson went to Inter–Serve to obtain a loan by falsely telling Inter–Serve she had been in an accident and respondent was representing her. Ms. Durham verified this information when contacted by an Inter–Serve employee. Ms. Durham instructed Ms. Patterson to cash the $4,500.00 loan check and give Ms. Durham the cash. Ms. Durham gave Ms. Patterson $100.00 in cash. Ms. Patterson never received any more of this money. Inter–Serve was never repaid.

Ms. Patterson testified Ms. Durham told her the money was needed because the IRS was investigating respondent and respondent needed the money to pay her taxes. Ms. Patterson admits she never discussed the loan with respondent. However, according to Ms. Patterson, respondent was in the office during the transaction and saw Ms. Durham hand Ms. Patterson $100.00.[4] Although respondent admitted she was having to pay back taxes to the IRS during this time, respondent denied having any knowledge of this transaction. However, respondent testified she had observed Ms. Durham giving Ms. Patterson and other family members money in the past.

Russell Fair is Ms. Durham's son. At Ms. Durham's direction, Mr. Fair obtained a loan from Inter–Serve. Ms. Durham had already filled out the paperwork and had cleared the loan with Inter–Serve by confirming that Mr. Fair was a client of respondent. Mr. Fair testified respondent never represented him on a personal injury claim. Pursuant to Ms. Durham's instructions, Mr. Fair took the loan check for $3,500.00 to the bank, cashed it, brought the cash back to Ms. Durham, and was given $50.00 in cash by Ms. Durham. Mr. Fair never received any more money. Further, Inter–Serve was never repaid.

---

**4.** Respondent's law firm included a small office for Ms. Durham and an office for respondent, separated by a small conference room. Both Ms. Patterson and Russell Fair testified all transactions took place in Ms. Durham's office.

Mr. Fair testified that although respondent was present in the office during this transaction, he did not discuss the loan with respondent. Respondent denied knowledge of this transaction.

Lawrence Fair is the brother of Ms. Durham. Mr. Fair claimed respondent asked him to get a loan from Inter–Serve so she could pay her taxes. According to Mr. Fair, respondent promised she would repay the loan. However, Mr. Fair testified Ms. Durham was the one who set up the loan with Inter–Serve and who falsely verified that he was a client of respondent. Mr. Fair testified he had never been a client of respondent. Mr. Fair cashed his loan check and took the cash to Ms. Durham. She gave him a portion of the cash for his trouble. Inter–Serve was never repaid.

## Social Security Client

Respondent represented a client on a social security claim. According to client he borrowed $3,000.00 from Inter–Serve on April 30, 1992. He then turned over the check to respondent. Respondent told client she was going to put the money in escrow for medical bills and "whatnots." Respondent did not pay the medical bills; instead, client had to pay these bills himself.

The $3,000.00 check was deposited into respondent's trust account. Three checks, one for $800.00, one for $475.00, and one for $300.00, were written on respondent's trust account for client. The $475.00 check was redeposited into the trust account, and the $800.00 check and $300.00 check were deposited into respondent's operating account. The signatures on these checks were produced with a signature stamp.

On July 2, 1992, a check was written to respondent on the trust account for $682.58. A portion of this check was deposited into respondent's personal account. Respondent's signature on the check was made with a signature stamp. Respondent testified it was possible the endorsement on the back of this check was not her signature. On July 3, 1992, a check was written to respondent on the trust account for $400.00 for "[client]." The respondent's signature on the front of this check was made with a signature stamp. However, a handwriting expert testified there were indications that respondent

endorsed this check.[5] A portion of this check was deposited into respondent's personal account. Respondent denied endorsing this check. Respondent testified she left a deposit book for her personal account in the office.

A series of checks totaling $831.00 were issued on the trust account to client from April 30 to August 1992. Therefore, a total of $3,013.58 was withdrawn from respondent's trust account during this time.

Respondent testified part of the proceeds from this Inter–Serve loan was used to pay for her services. According to respondent, in addition to representing this client in the social security matter, she also handled other matters, including child support issues, for him. Client claimed respondent did not do any work for him on the social security matter and, in fact, he successfully concluded the matter himself.

▮ The Panel found respondent, by delegating to Ms. Durham the complete operation of her office with little or no supervision, violated Rule 407, SCACR, Rule 5.3 by failing to assure Ms. Durham's conduct was compatible with respondent's professional obligations. This failure to supervise facilitated Ms. Durham's scam of Inter–Serve and her embezzlement of funds belonging to respondent's clients. Further, the Panel found respondent violated Rule 407, SCACR, Rule 1.15 by failing to monitor her trust account and safeguard her clients' funds. The Panel concluded had respondent complied with Rule 407, SCACR, Rule 1.15, respondent could have prevented Ms. Durham's embezzlement. Although the Panel found respondent was not directly involved with the Inter–Serve matters except for the Social Security client, the Panel held respondent responsible for Ms. Durham's conduct because respondent should have noticed the many warning signals concerning Ms. Durham's criminal activity, including the advice given by her brother and her colleague. The Panel concluded Complainant had not clearly and convincingly demonstrated respondent was a co-conspirator with Ms. Durham in the Inter–Serve scam. The Panel found Russell Fair's testimony incredible and did not address Lawrence Fair's

---

5. "Indications" means the handwriting expert is approximately 60% sure the signature is respondent's.

testimony. The Panel did not mention Mr. King's testimony in its report.

As to the Inter–Serve matters concerning Ms. Durham's relatives, we agree with the Panel's conclusions of law. However, in addition to finding Russell Fair's testimony not credible, we also find the portions of Ms. Patterson's and Lawrence Fair's testimony which attempted to include respondent in this scam unbelievable. Further, while we believe Mr. King generally discussed the loans with respondent, we do not find that at the August 1992 meeting they discussed specific cases. Instead, it is our opinion Mr. King discussed specific cases with Ms. Durham since she was the person with whom he usually dealt. Thus, we do not find the evidence clearly and convincingly supports the conclusion respondent was participating in this scam or had knowledge of this scam. However, respondent's lack of supervision of Ms. Durham created this problem, and therefore, respondent is ethically responsible for Ms. Durham's conduct.[6]

As to the Social Security client, the Panel concluded respondent had written the check for $800.00 which was deposited into her operating account and the check for $400.00 which was deposited into her personal bank account. Thus, the Panel implicitly found the endorsement on the back of the $400.00 check was respondent's signature and not a forgery. In our opinion, the endorsement on the $400.00 check does not appear to be respondent's signature. The endorsement on the $682.58 check is not respondent's signature. Instead, we find these signatures are forgeries. Only a small portion of the cash from these checks was actually deposited into respondent's personal account ($20 of the $400.00 check and $175.58 of the $682.58 check). The balance of the money was received as cash. Ms. Durham had access to respondent's personal account and respondent testified Ms. Durham had done some of her personal banking in the past. As to the checks deposited into the operating account, we note the signatures on these checks are by signature stamp. Thus, we find Ms. Durham was the only one writing these checks. However, respondent's lack of supervision of Ms. Durham and her

6. The Inter–Serve matters have been resolved and Inter–Serve has been repaid $16,000.00 by respondent's insurance company.

failure to properly monitor her bank accounts created these problems and she is ethically responsible for Ms. Durham's misappropriation of these funds in violation of Rule 407, SCACR, Rules 1.15 and 5.3. If respondent had been properly monitoring her bank accounts she could have at least mitigated the damage caused by Ms. Durham's conduct.

### Criminal Matter

Respondent was retained by client's brother[7] (Brother) to represent client in a criminal matter. While represented by other counsel, the client was convicted of murder in Orangeburg County on July 14, 1991 and pled guilty to conspiracy in Hampton County on October 23, 1991.

According to respondent, on or about October 14, 1991, respondent and Ms. Durham met with Brother in Augusta, Georgia, to discuss her representation of client in a post conviction relief (PCR) proceeding in the Orangeburg County matter. Respondent testified she agreed to represent client in the PCR matter for a fee of $15,000.00, plus costs. Respondent claimed she was not hired to represent client in the Hampton County case since the client had not yet terminated the services of his other attorney. According to respondent, Brother was to obtain a refund of a portion of the fee paid to client's previous attorney and he would use this refund to pay respondent's fee. Respondent testified she discussed the refund and payment of the fee with Brother several times. According to respondent, financial matters were only discussed with Brother.

Client testified respondent was retained to represent him in the Hampton County matter and to pursue PCR in the Orangeburg County matter for $15,000.00, plus costs. Client claimed in December 1991, respondent personally requested $5,000.00 to pay for a transcript of the Orangeburg County trial. Client testified respondent accepted several collect calls made by him to her office.

It is undisputed that on October 21, 1991, $15,000.00 was bank wired into respondent's account by client's family. Fur-

---

7. Brother died on November 24, 1994.

ther, on December 3, 1991, an additional $5,000.00 was bank wired into respondent's account by client's family.

Respondent met with client on Sunday, October 20, 1991.[8] Respondent also met with client at least one other time before receiving the December 3, 1991, payment of $5,000.00. Respondent testified she was unaware of the October 21, 1991, wire transfer of $15,000.00 until Brother advised respondent of this payment in August 1994. According to respondent, she was only aware of the $5,000.00 and she thought that money was sent so she would begin to work on the PCR matter.

The day after the wire transfer of $15,000.00 was received, Ms. Durham wrote a check to herself on respondent's account for $11,000.00. On December 4, 1991, Ms. Durham wrote another check to herself on respondent's account for $4,000.00. Respondent's signature stamp was used to sign the checks. Ms. Durham pled guilty in December 1996 to writing these checks to herself.

Respondent did not appear in the Hampton County matter. Instead, client's previous attorney handled this matter. Respondent filed a Notice of Appeal (NA) in the Hampton County matter in November of 1991; however, it was dismissed by this Court due to the failure of respondent to file an initial brief and to designate material to be included in the Record on Appeal. Respondent did not seek nor receive permission from client to abandon this appeal. Respondent testified she filed the NA in order to protect client; however, because she was never retained to pursue this matter she permitted the appeal to be dismissed without discussing the dismissal with client.

Respondent requested a transcript of the Orangeburg County trial on April 4, 1993. The court reporter on three occasions requested payment from respondent before payment was effected. The cost of the transcript was $1,223.70. Respondent testified she delayed ordering the transcript because she had not yet received her full fee of $15,000.00. Further, respondent claimed she delayed making payment in hopes that client's family would provide the necessary funds to cover this expense.

---

8. The Panel mistakenly found this was the date of the meeting in Augusta.

The Panel concluded the evidence was not clear and convincing that respondent had been retained to represent the client in the Hampton County matter; therefore, respondent committed no ethical violations by failing to attend court. However, the Panel found respondent failed to act with reasonable diligence and promptness in representing client in violation of Rule 407, SCACR, Rule 1.3 by filing a NA in the Hampton County matter and then failing to either perfect the appeal or seek permission of her client to abandon the appeal.

Further, the Panel found it incredible that respondent would travel over two hours to visit with the client prior to receiving payment or that respondent would expend any time or effort on the case between the initial meeting with client's family and the receipt of the $5,000.00 on December 3, 1991, when respondent admitted she knew nothing of client's family's financial resources or reputation prior to the initial meeting. Thus, the Panel implicitly concluded respondent was aware of the initial $15,000.00 wire transfer. However, the Panel did not reach the issue of whether respondent had participated in a "scam" to obtain an additional $5,000.00 from client's family. Instead, the Panel concluded the evidence clearly and convincingly demonstrated respondent had violated Rule 407, SCACR, Rule 5.3 by failing to adequately supervise Ms. Durham.

Finally, the Panel concluded respondent did little or no work in return for the payments of $15,000.00 and $5,000.00. The transcript of the Orangeburg trial was not ordered until April 1993. Further, a PCR application was never filed. Respondent has neither accounted for nor refunded any of the monies paid by client's family.

We do not find it incredible that respondent would begin preliminary work on the PCR matter prior to receiving any payment. Further, because respondent had, for all practical purposes, delegated the day to day operations of the office to Ms. Durham, we find it believable that respondent was unaware of the first wire transfer of $15,000.00. At this time, respondent's bank statements were being sent directly to Triple A Bookkeeping. Thus, respondent had little first hand knowledge of her bank accounts. Instead, she depended on Ms. Durham to keep her informed. We find that respondent

was only aware of the $5,000.00 wire transfer and that she thought this was a partial payment of her fee and was not money with which to order a transcript. In our opinion, respondent was not attempting to defraud client's family. However, we agree with the Panel's finding respondent violated Rule 407, SCACR, Rule 5.3 by failing to adequately supervise Ms. Durham. Respondent gave Ms. Durham unrestrained control over the financial affairs of her office and failed to monitor Ms. Durham's activities. Respondent also violated Rule 407, SCACR, Rule 1.15 by failing to adequately monitor her trust account. If respondent had reviewed her bank statements, she would have realized there was a discrepancy. Further, we find respondent violated Rule 407, SCACR, Rule 1.3 by failing to act with reasonable diligence and promptness in representing client. Even after respondent became aware that client's family had paid her office $20,000.00, respondent still did not file a PCR application. In addition, respondent violated Rule 407, SCACR, Rule 1.3 by abandoning the Hampton County appeal without first obtaining client's permission.

### Retaining Out of State Attorney for Client

In February 1992, a client contacted respondent's office seeking legal representation for a matter in the State of Georgia. Ms. Durham informed the client that for a reasonable fee respondent would locate a Georgia attorney for her. The amount of fee was not specified and the parties did not enter into a written contract.

Client gave Ms. Durham a check for $5,000.00 which was to be used as a retainer for the Georgia attorney. Neither respondent nor Ms. Durham retained a Georgia attorney for this client. Instead, client retained a Georgia attorney herself and was forced to pay the attorney's retainer fee without access to the $5,000.00 she had previously given to respondent's office for this purpose.

After client's $5,000.00 check was deposited in respondent's trust account, $3,000.00 was withdrawn and deposited into respondent's operating account. At that time, no accounting was sent to client showing how respondent had earned the $3,000.00. While it is unclear who caused this transfer of

funds, the record repeatedly demonstrates Ms. Durham controlled the operations of respondent's office and had full and total access to these accounts.

During this time, client asked respondent's office to retain a Georgia attorney for another matter. According to client, she told Ms. Durham she only had $1,100.00 and Ms. Durham told her that would be sufficient. Thus, client signed over the $1,100.00 two-party check to respondent's office. Ms. Durham assured client this money would be used to pay the Georgia attorney. A Georgia attorney was located for client; however, client had to pay the attorney the retainer without access to the $1,100.00 she had previously given to Ms. Durham.

Client attempted to communicate with respondent or respondent's staff about these matters, but client's telephone calls were not returned. Further, when client was able to speak to someone in respondent's office, it was always Ms. Durham, who continued to assure client that all was well with her Georgia cases.

Eventually, client initiated a fee dispute claim. The billing statement submitted by respondent was not prepared until after the fee dispute claim had been filed. The statement was prepared by respondent and Ms. Durham from memory, notations in files, and telephone bills.

Respondent testified her office worked on several other matters for client during this time. Thus, her fee reflected both her work on the Georgia matter and her work on these other matters. The fee dispute was resolved in February 1993 when respondent agreed to refund client $5,500.00.

The Panel concluded, through respondent's failure to properly control and supervise Ms. Durham, client funds were improperly appropriated to respondent's use for operating expenses, client funds were improperly handled, and client was not rendered a prompt and full accounting. Rule 407, SCACR, Rule 1.15. The Panel also concluded respondent failed to keep her client reasonably informed about the status of client's matters and failed to comply promptly with reasonable requests for information in violation of Rule 407, SCACR, Rule 1.4(a). In addition, respondent failed to ensure the conduct of her employee, Ms. Durham, was compatible with respondent's professional obligations by failing to correctly

record time expended on client matters, by failing to oversee expenditures of funds from trust accounts, by failing to properly distinguish between the use of monies held in trust accounts and operating accounts, and by failing to properly supervise her office staff, all in violation of Rule 407, SCACR, Rule 5.3. Finally, the Panel concluded respondent's conduct had violated Rule 413, SCACR, ¶ 5(E) (demonstrating a current unfitness to practice law).

While we agree with the Panel's findings, we further find respondent violated Rule 407, SCACR, Rule 1.3 by failing to act with reasonable diligence and promptness in representing her client because client was forced to seek her own attorney even though she had retained respondent to find an attorney for her.

### Lowry Detective Agency Matter

■ Mr. Davy Lowry was the owner of Lowry Detective and Investigation Agency. Mr. Lowry testified he entered into a verbal contract with respondent and Ms. Durham in which, for a flat fee of $600.00, he would provide investigatory services in simple domestic situations.[9] Respondent's clients were to pay an initial retainer and if the investigation was successful, Mr. Lowry would depend on a court order directing the other party to pay the private investigation costs to recover his fee. Mr. Lowry testified he only had direct contact with one of respondent's clients and he billed respondent and not the client for his services because the contract was between respondent and Mr. Lowery. Respondent denied any such agreement existed and claimed her clients were directly responsible for the payment of investigatory expenses.

Mr. Lowry brought an action against respondent in Magistrate's Court to collect the unpaid fees. In the fall of 1994, the magistrate dismissed the matter finding the agreement violated the statute of frauds. However, the magistrate directed respondent to provide Mr. Lowry with names and addresses of the delinquent accounts. Respondent did not comply with this directive until January 20, 1995. Further, according to Mr. Lowry, two of the addresses were incorrect. Respondent testified these addresses were from her files.

---

9. Mr. Lowry also provided process service for respondent.

At least one of the clients contacted by Mr. Lowry claimed she had paid respondent's firm for the investigative services. However, respondent's firm failed to pay this money to Mr. Lowry. Ms. Durham receipted the client for the cash payment on the investigatory account and all parties concede Ms. Durham appropriated this money. Mr. Lowry claimed respondent still owed him $1560.

The Panel concluded respondent and Mr. Lowry had entered into an agreement with regard to payment for investigation services provided to her clients and respondent committed acts of deceit in attempting to avoid payment for these services thus violating Rule 407, SCACR, Rule 8.4(d) (engaging in conduct involving deceit or misrepresentation). The Panel further found respondent violated Rule 407, SCACR, Rule 5.3 by failing to adequately supervise Ms. Durham. In this instance, Ms. Durham only misappropriated $150.00; however, because this was not an isolated event, the Panel found it to be further proof of respondent's dismal performance in supervising this employee. The Panel concluded respondent did not violate Rule 407, SCACR, Rule 1.15 or Rule 8.4(b) because respondent did not have knowledge of Ms. Durham's activities. The Panel found respondent violated Rule 413, SCACR, ¶ 5(D)[10] by procrastinating in her obligation to provide Mr. Lowry with the addresses of her clients and by providing Mr. Lowry with incorrect addresses. We agree with the Panel's findings of fact and conclusions of law in this matter.

### Real Estate Matter

A client retained respondent to represent her in the purchase of real estate for a church. Client testified at the hearing that she had informed respondent of her intention to purchase three lots prior to the November 1993 closing; however, in May 1994, client discovered she had only purchased one lot. The deed prepared by the seller's attorney had omitted two of the parcels of land. Respondent claimed she was unaware at the time of the closing that client intended

---

**10.** Rule 413, SCACR, ¶ 5(D) defines misconduct as "[c]onduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating unfitness to practice law."

to purchase three lots. All closing documents refer to only one lot, including documents prepared by the bank.

Upon discovering the problem, client contacted respondent. After respondent agreed to attempt to rectify the problem, respondent failed to return several of client's telephone calls and keep client informed of the status of this matter. Eventually, respondent prepared a deed conveying the other two lots and sent it to seller's attorney. However, client had to retain another attorney to complete the matter because respondent failed to obtain the seller's signature on the corrected deed. Client testified she did not pay respondent for her attempt to correct the deed.

The Panel found the error in the deed and respondent's efforts to remedy the error did not give rise to an ethical violation. The Panel did find respondent violated Rule 407, SCACR, Rule 1.4(a) by failing to keep her client reasonably informed about the status of a matter and by failing to comply promptly with reasonable requests for information. We agree with the Panel's findings of fact and conclusions of law. However, we further find respondent violated Rule 407, SCACR, Rule 1.3 by failing to promptly and diligently pursue this matter on behalf of the client. Respondent's procrastination forced the client to seek another attorney to handle this matter.

### Divorce Matter

Through Ms. Durham, a client retained respondent in 1991 to bring a separate maintenance and divorce action on her behalf. Client and her husband went to respondent's office where Ms. Durham prepared their separation agreement, a complaint for a divorce and an answer. Client's husband paid Ms. Durham $500.00. Ms. Durham informed the couple that it would take one year for the divorce to be final and she would contact client with the court date for the divorce. Further, Ms. Durham told the couple they would owe an additional $500.00 when the divorce was finalized. The complaint contains respondent's signature; however, respondent claimed she had no first hand knowledge of this client. The complaint was filed in 1991. Subsequently, the complaint was dismissed by the family court for lack of prosecution.

Although client attempted to contact Ms. Durham or respondent several times, she was unable to reach either of them until 1995.

In 1995, client contacted respondent who was unaware of her representation of client and had no record of this client ever visiting her office. Prior to this communication, client had never met respondent. Respondent informed client of Ms. Durham's improper activities including agreeing to represent clients and receiving payment for services that were never performed. Respondent told client she would complete the work in this matter; however, she explained it would cost $300.00 more to complete the action. After this meeting, client called respondent on numerous occasions, but her telephone calls were never returned. Finally, after client's mother contacted someone at respondent's home regarding this matter, respondent called client and claimed client had broken several appointments with her. Client then obtained another attorney to represent her and she eventually obtained a divorce. Respondent refunded $500.00 to client when she was informed client had obtained another attorney. During this time (1995–96), respondent was undergoing treatment for cancer and was often out of the office.

The Panel concluded respondent failed to act with reasonable diligence and promptness in representing client and failed to keep client reasonably informed of the status of this case and to respond promptly to reasonable requests for information. Rule 407, SCACR, Rules 1.3 & 1.4(a). In addition, the Panel found respondent failed to supervise and control her employee in violation of Rule 407, SCACR, Rule 5.3. We agree with the Panel's findings of fact and conclusions of law in this matter.

### Other Trust Account Matters

The Panel found, from September to December 1993, respondent's trust account showed several insufficient funds charges and negative balances. Although the Panel acknowledged that these problems were probably caused by Ms. Durham, the Panel concluded respondent has an ethical obligation pursuant to Rule 407, SCACR, Rule 1.15 to monitor her trust account and this she clearly failed to do. We agree with

the Panel's findings of facts and conclusions of law on this matter.

## SANCTION

The authority to discipline attorneys and the manner in which the discipline is given rests entirely with the Supreme Court. *Matter of Hines,* 275 S.C. 271, 269 S.E.2d 766 (1980).

Both the Panel and Committee recommended a one year suspension. In addition, the Committee recommended respondent complete LOMAP and make restitution before being readmitted to practice. The Panel and Committee found respondent violated Rule 407, SCACR, Rules 1.1, 1.3, 1.4(a), 1.15, 5.3, & 8.4(d); and Rule 413, SCACR, ¶ 5(D) & (E). Most of these violations were the result of respondent failing to properly supervise Ms. Durham and failing to properly monitor her bank accounts. We agree respondent violated the above rules; however, we disagree with the Panel's and Committee's recommendation for a sanction.

This Court has sanctioned attorneys for failing to supervise their employees and for misappropriating funds. In *Matter of Craig,* 317 S.C. 295, 454 S.E.2d 314 (1995), this Court suspended attorney for fifteen months for failing to supervise employees, negligently managing the trust account, misappropriating funds, lacking diligence in representing his clients, and failing to cooperate with the investigation. In *Matter of Gibbes,* 315 S.C. 186, 432 S.E.2d 482 (1993), this Court imposed a public reprimand on attorney for failing to supervise an employee who engaged in misconduct. In *Matter of Gibbes,* attorney did not commit multiple acts of misconduct. In *Matter of Bell,* 304 S.C. 529, 405 S.E.2d 825 (1991), the attorney received a public reprimand for negligently supervising employees, for failing to correctly post expenses to clients' accounts, and for failing to timely disburse client funds. The attorney did not misappropriate funds in *Matter of Bell.*

While there is no allegation respondent failed to cooperate with this investigation, respondent's misconduct involved multiple violations of the Rules of Professional Responsibility, Rule 407, SCACR, including misappropriation of funds. Further, respondent created many of these problems by delegat-

ing to Ms. Durham such a wide breadth of responsibilities and duties without adequately overseeing Ms. Durham's actions. Respondent delegated complete control of her office to Ms. Durham and did little to ensure Ms. Durham was running the office in an ethical manner. Respondent allowed Ms. Durham to work in her office from 1991 until 1994 without any real supervision of her activities. Instead, she gave Ms. Durham unfettered control of her office, including her financial affairs. Because respondent chose not to review her bank statements during this time period, Ms. Durham's actions remained undetected and unchecked for three years. Thus, we find respondent's misconduct warrants a harsher sanction than a public reprimand.

 However, in choosing the appropriate sanction, the Court may consider circumstances in mitigation. *Matter of Brown*, 286 S.C. 454, 334 S.E.2d 281 (1985). Several witnesses testified on behalf of respondent. Carl Benson testified Ms. Durham was a good liar and he did not think respondent was involved in Ms. Durham's schemes. Ms. Durham's ex-husband testified that although Ms. Durham had been arrested for writing bad checks in the past, Ms. Durham had a good reputation in Anderson. Mr. Durham further testified he did not tell respondent about Ms. Durham's previous problems.

William Bannister testified respondent resolved a child support matter for him without further compensation after he told respondent he had previously paid Ms. Durham to resolve this issue. Curtis Mattison testified when he discovered Ms. Durham had not properly handled his real estate closing, respondent corrected the problem without charge. Mr. Bannister and Mr. Mattison were "clients" Ms. Durham had undertaken to represent without respondent's knowledge. As to the Divorce Matter, we note during the time period respondent was attempting to straighten out the matter for client, respondent was diagnosed with cancer and her treatment resulted in time away from the office. Also, respondent did return the $500.00 client had previously paid to Ms. Durham. Thus, respondent attempted to help those "clients" who had paid Ms. Durham for services she never provided. Further, respondent attempted to refund the money Ms. Durham had taken from these "clients" if she was unable to help them. Respon-

dent did this even though she never actually received any of the money from Ms. Durham.

Elizabeth Williams testified respondent handled the financial affairs for the church and there had never been a problem. Several attorneys who practiced with respondent testified respondent was a good lawyer. The Public Defender in Anderson County stated he would continue to employ respondent if she is allowed to continue to practice law.

Finally, there was no evidence suggesting respondent personally benefitted from Ms. Durham's scams. Instead, all evidence suggests these scams harmed respondent at least as much as they did her clients.

In consideration of all the facts in this case, we find the appropriate sanction for respondent's misconduct is a definite suspension from the practice of law for six months. In addition, respondent must make restitution and complete LO-MAP prior to reinstatement.

Respondent shall file, within fifteen (15) days of this opinion, an affidavit with the clerk of this Court stating she has complied with Paragraph 30 of Rule 413, SCACR.

**DEFINITE SUSPENSION.**