524 S.E.2d 100

**In the Matter of Ernest E. YARBOROUGH, Respondent.**

**No. 24951.**

Supreme Court of South Carolina.

Heard Feb. 3, 1999.

Decided June 7, 1999.

246

Attorney General Charles M. Condon and Senior Assistant Attorney General James G. Bogle, Jr., both of Columbia, for the Office of Disciplinary Counsel.

Ernest E. Yarborough, of Winnsboro, pro se.

PER CURIAM:

In this attorney disciplinary proceeding, respondent, Ernest E. Yarborough, is charged with committing misconduct arising out of his alleged improper conduct toward a client. We find respondent committed misconduct and impose a public reprimand.[1]

---

1. On April 3, 1997, respondent was placed on interim suspension for being convicted of a serious crime. Respondent is appealing his

## FACTS

Client testified on or about June 24, 1996, respondent was retained to represent her as Personal Representative of her brother's estate in a legal malpractice action against Attorney I, who had been retained to handle a wrongful death action on her behalf. At that time, client was an unmarried, 24 year old college student. Respondent provided client with his business card which also listed his home and car telephone numbers.

On Saturday, June 29, 1996, a day after the retainer was paid, respondent traveled to Spartanburg and met client and her mother at their house. Respondent, client, and her mother then all rode in client's mother's car to interview witnesses in the wrongful death case. Because they were unable to locate one witness, respondent decided to stay overnight. While still riding in the car, respondent inquired about a local church and when he discovered it was the church client attended he commented he would attend church with her the following day. Client's mother did not attend this particular church.

Client testified respondent asked client to go with him to the mall so he could purchase a suit. While the suit was being altered, respondent asked client to watch a movie with him. After the movie, respondent inquired about the location of a hotel. Client showed him to a Day's Inn. Respondent asked client to come to his room and talk. They conversed about the case for approximately 30 minutes. Upon leaving, respondent asked client to give him a hug. Client complied with the request. She testified it was an innocent hug and nothing inappropriate happened. The next day, respondent attended church with client.

Client testified the next weekend, July 6, 1996, respondent called and advised her he was returning to Spartanburg to interview another witness. Respondent told client he was staying at a certain hotel and asked client to bring him some razors. Client testified when she arrived at the hotel with the razors that afternoon, respondent began kissing and hugging

conviction and that appeal is pending before the South Carolina Court of Appeals. Disciplinary proceedings have been stayed in this matter. Further, on December 14, 1998, respondent was disbarred from practicing before the United States Court of Appeals for the Fourth Circuit.

her. When she told respondent to stop, he complied, but he made some derogatory comments to client, including inquiring if she was a lesbian or if she had been molested as a child. Respondent paid client the money for the razors and she left the hotel. Because she was upset, client testified she went to the home of her aunt and related the incident to her. Client denied making any romantic advances toward respondent.

Client testified she did not immediately fire respondent because she had no money to hire other counsel and she had a summary judgment motion pending. However, she did advise respondent she was going to file a grievance against him. Client testified respondent continued telephoning her. According to client during these telephone calls, respondent asked her to meet him in various towns, requested client act passionately toward him, asked her to have his baby, and asked her to marry him. During the calls, respondent also made explicit comments regarding the effect client had on him physically. The telephone records of respondent's home telephone number reflected many calls were made to client in the evening, outside of normal business hours. Further, client's telephone records reflected a number of telephone calls from her to respondent at night. However, client testified many of these calls concerned the case and a possible settlement. Further, according to client, some of these calls may have been made by her mother, with whom she lived. Client testified respondent did not send her any cards, letters, or gifts. However, respondent had promised to buy her a dress, but he never did.

Client admitted on August 26, 1996, she hired respondent to represent her on another legal malpractice action against Attorney II, who had also been retained to handle the wrongful death action.[2]

---

2. Client was originally represented by Attorney II in the wrongful death action. On or about October 25, 1993, Attorney II was relieved from further representation. Attorney I assumed representation of client. Summary judgment was granted in favor of the defendants in this action on or about March 24, 1994. Client then retained Attorney III to sue Attorney I for legal malpractice. A similar lawsuit was filed against Attorney II. Because Attorney I brought a third party plaintiff action against Attorney III, on or about February 27, 1996, Attorney III was relieved from representation of client in the lawsuit filed against Attor-

Client's mother testified she had driven respondent, her daughter and herself around Spartanburg interviewing witnesses on the first weekend. Further, she testified when her daughter returned from respondent's hotel after the second visit she was acting "sadly." The mother testified client told her of respondent's unwelcome sexual advances a day or so. after it occurred. The mother admitted she did not express outrage to respondent because she was afraid he would no longer represent them.

The mother testified because she was suspicious of respondent's request that client travel to Union to meet him, she accompanied her daughter. According to the mother, respondent reacted in a shocked fashion when he saw her with client.

The mother testified respondent asked her if she thought he would make a good husband for her daughter. The mother verified both she and her daughter called and talked to respondent on many occasions.

Client's aunt testified client arrived at her house unexpectedly on the day of the incident, upset and crying. Client related she had gone to respondent's hotel room and he hugged her and tried to kiss her. The aunt testified she talked with client for an hour or two and advised her not to meet with respondent alone in the future. The aunt testified she thought her niece was flattered by the attention shown previously by respondent but client had never expressed any attraction to respondent. The aunt admitted client had mentioned a professor at college. But, according to the aunt, the relationship was not romantic.

Respondent's testimony confirmed when he was retained by client in June 1996, a motion for summary judgment was pending for July 9, 1996, and a great deal of preparation was necessary. Respondent admitted he gives clients his home telephone number and tells them to call him anytime. Respondent admitted he often talked with client on the telephone. Further, many of these telephone calls were made in the evenings. Respondent testified most telephone calls would last approximately 3–5 minutes unless the mother also spoke on the telephone. Then the calls would exceed 30

---

ney I; however, she continued to represent client in the lawsuit against Attorney II until August 23, 1996.

minutes. Respondent testified 95% of the calls would be business related. Respondent testified he gave client's calls top priority because client and her mother were very demanding and he wanted to keep them satisfied.

Respondent testified when he traveled to Spartanburg the first weekend he did not intend to spend the night. However, he decided to stay over in order to talk with a witness. Respondent denied he invited himself to church. Instead, he claimed he was invited by client and client's mother. Further, respondent claimed they invited him to spend the night at their house. However, he declined this invitation. Respondent admitted he went to the mall to buy a suit, and while it was being altered, he suggested he and client see a movie. Respondent testified each paid for their own admission. Respondent testified it was close to midnight when client showed him to the hotel. Further, according to respondent, client asked to go up to his room so she could talk about the case, and respondent consented. Respondent claimed they talked about the case until approximately 2:00 a.m. Client became upset during the discussions regarding her brother and started crying. As client left the room., she gave respondent a "church hug."

Respondent admitted he called client from his car on the way to Spartanburg the second weekend to advise her when he would arrive. When she arrived at the hotel, he and client went to a store so he could purchase razors. He denied asking client to purchase the razors. When they returned to the hotel, client advised respondent the witness was unavailable. Respondent testified when he told client he was going to leave, client became irate because respondent was not there to see her. Respondent testified, as client left the room, she hugged him in the same manner as before. Respondent claimed he did not touch client and that she was not the type of person to whom he was normally attracted. Respondent testified on the second visit he expected both client and her mother to come to the hotel and to ride him around as was done previously.

On cross examination, respondent testified on neither weekend did he try to find a neutral site such as a hotel conference

room or meeting room in order to discuss the case with client. Further, in hindsight, he admitted this was poor judgment.

Respondent testified, in hindsight, he realized the mother "was trying to play matchmaker" because she had noticed respondent was not wearing a wedding band. Respondent testified the mother asked him if "a lawyer would make a good husband [for client]." Respondent denied asking the mother if he would make a good husband for client. At the time, respondent did not take the mother's comments seriously. However, he made it clear he did not get involved with clients. When the mother began to make comments about client's infatuation with respondent, respondent advised the mother he would terminate his representation if client did not get her feelings under control. Respondent denied he had done anything to lead her on. Respondent testified client was a very strong minded person and they had personality conflicts.

Respondent testified because time was of the essence, he utilized client as a runner for obtaining necessary signatures on affidavits. According to respondent, client and her mother traveled to Columbia to facilitate this process. Further, respondent testified he did not recall asking client to come to Union, but doubted he did because he was involved in a serious trial. However, he confirmed he had asked client to come to Newberry while he was in trial to pick up some affidavits.

Respondent testified client revealed to him she was involved with a professor at college. According to respondent, when she expressed concern over being a virgin, respondent joked about her being a lesbian. Further, respondent related that client had told him the professor was pressuring her to become intimate and respondent inquired if client was afraid of becoming pregnant. Respondent denied asking client to have his baby.

Respondent confirmed he was hired on the second legal malpractice case in August 1996. Respondent claimed the relationship started to sour around October 28, 1996, the date of the motion for dismissal and summary judgment against Attorney I. The mother and client had become outraged and antagonistic toward him because the expert had determined client's brother had died of cocaine ingestion. Further, after

the case was dismissed because previous counsel had failed to obtain proper service of an amended complaint, client threatened to "bring him down." Respondent testified client fired him on October 28, 1996, but he felt he was in a "Catch 22" because a summary judgment motion was approaching in the other action on November 5, 1996. Therefore, respondent prepared for and attended the hearing. At the November 5, 1996 hearing, client advised the court of respondent's alleged sexual harassment. Respondent felt this was simply an attempt by client to obtain a continuance which the court would otherwise not allow. Client was granted a continuance and respondent was relieved as counsel. Following the October 28, 1996 hearing, client retained another attorney to represent her in these actions. This attorney did not require a retainer.

Formal charges alleged respondent had engaged in a pattern of conduct consisting of sexual harassment and/or improper sexual conduct toward a client, thereby violating Rule 7(a)(1), (5), and (6) of the Rules For Lawyer Disciplinary Enforcement, Rule 413, SCACR (RLDE), and Rule 1.7(b) and 8.4(c) and (e) of the Rules of Professional Conduct, Rule 407, SCACR (RPC). After a hearing, a subpanel of the Commission on Lawyer Conduct (Commission) found misconduct and recommended respondent receive a public reprimand. The subpanel concluded this misconduct violated Rule 7(a)(1), (5), and (6) of the RLDE, and Rule 8.4(a), (c) and(e) of the RPC. The full Commission adopted the subpanel's report.

## *DISCIPLINARY VIOLATIONS*

Although this Court is not bound by the findings of the subpanel and Commission, these findings are entitled to great weight, particularly when the inferences to be drawn from the testimony depend on the credibility of the witnesses. *Matter of Marshall*, 331 S.C. 514, 498 S.E.2d 869 (1998); *Matter of Yarborough*, 327 S.C. 161, 488 S.E.2d 871 (1997). However, this Court may make its own findings of fact and conclusions of law. *Matter of Marshall*, supra. Further, a disciplinary violation must be proven by clear and convincing evidence. *Id.*

We agree with the subpanel and Commission's conclusion that, by clear and convincing evidence, respondent com-

mitted misconduct by making an unwanted sexual advance toward client on July 6, 1996, and by making inappropriate sexual comments to client. The resolution of this matter turns on the credibility of client and respondent. The subpanel concluded respondent's testimony was not credible and client's version of events was credible. In reaching this conclusion, the subpanel relied on the fact that client's testimony was corroborated by the testimony of her mother and her aunt. The fact that these witnesses were sequestered further supported this conclusion. In finding respondent's version of the incident not credible, the subpanel noted inconsistencies in respondent's testimony such as doubting he asked client to come to Union because he was involved in a "serious" trial, however, admitting he asked client to come to Newberry while he was in trial. As noted by the subpanel, instead of denying making the improper comments, respondent only claimed they were taken out of context. Further, respondent never denied the touching occurred. Instead, he asserted client instigated the contact. We agree with the subpanel's finding that client's version of the events was credible and respondent's version was not credible.

Respondent's misconduct violated Rule 7(a)(1)(violating or attempting to violate the RPC); Rule 7(a)(5)(engaging in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law); and Rule 7(a)(6) (violating the oath of office), of the RLDE. Further respondent violated Rule 8.4(a)(violating or attempting to violate the RPC); Rule 8.4(c) (engaging in conduct involving moral turpitude); and Rule 8.4(e) (engaging in conduct prejudicial to the administration of justice), of the RPC.

### SANCTION

The authority to discipline attorneys and the manner in which the discipline is given rests entirely with the Supreme Court. *Matter of Marshall,* supra; *Matter of Hines,* 275 S.C. 271, 269 S.E.2d 766 (1980).

*Matter of Bellino,* 308 S.C. 130, 417 S.E.2d 535 (1992), is factually similar to this case. In that case, attorney pled guilty to military charges involving attorney's inappropriate

touching of two female clients. *Id.* The clients had not consented to the touching. The military court found attorney unfit to be a marine. In addition to a 31 month temporary suspension, this Court suspended attorney for six months and required him to retake and pass the Professional Responsibility Examination. *Id.* This Court found the harsh sanction was appropriate because attorney's conduct constituted an abuse of the power he possessed as the clients' attorney. The clients were in vulnerable positions and attorney attempted to take advantage of their need for help. *Id.*

Similar cases from other jurisdictions involving inappropriate touching and comments to either clients or employees have resulted in a wide range of sanctions. See *Matter of Piatt,* 191 Ariz. 24, 951 P.2d 889 (1998) (attorney is publicly censured for making sexually harassing comments to clients); *People v. Dawson,* 894 P.2d 756 (Colo.1995) (attorney convicted of second degree attempted sexual assault and charged with sexual assault of a client was disbarred); *People v. Lowery,* 894 P.2d 758 (Colo.1995) (attorney was suspended for one year and one day for sexually harassing three female employees, including making inappropriate comments and engaging in unwelcome touching); *People v. Bergner,* 873 P.2d 726 (Colo. 1994) (attorney was publicly censured for participating in a conversation with a divorce client that was sexual in nature and made the client uncomfortable); *The Florida Bar v. McHenry,* 605 So.2d 459 (Fla.1992) (attorney was disbarred where he had improperly touched a female client and had masturbated in front of another female client and he had received two prior public reprimands); *Matter of Rinella,* 175 Ill.2d 504, 222 Ill.Dec. 375, 677 N.E.2d 909 (1997) (suspended attorney for at least three years where attorney took advantage of his superior position by pressuring three divorce clients into having sexual relations with him and attorney testified falsely in the disciplinary proceeding); *Iowa Supreme Court Bd. of Professional Ethics and Conduct v. Hill,* 540 N.W.2d 43 (Iowa 1995) (attorney, who was previously disciplined for engaging in sex with a client, was suspended from practice for at least one year where attorney made unwelcome sexual advances toward another client); *In re Howard,* 912 S.W.2d 61 (Mo.1995) (attorney was suspended for at least six months for sexual harassment of clients and for asserting in motions papers the

judge acted under "unusual amount of influence" from opposing counsel); *Columbus Bar Association v. Baker,* 72 Ohio St.3d 21, 647 N.E.2d 152 (1995) (attorney, who abused cocaine and alcohol, was placed on probation for two years for using vulgar and sexually explicit language in the presence of a 17 year old female employee); *State ex rel Oklahoma Bar Association v. Sopher,* 852 P.2d 707 (Okla.1993) (public reprimand was warranted where attorney made improper comments to a client and inappropriately touched the client without her consent); *Matter of Disciplinary Proceedings Against Heilprin,* 168 Wis.2d 1, 482 N.W.2d 908 (1992) (attorney, who had previously been disciplined for the same misconduct, was disbarred where he directed sexually explicit and suggestive comments and questions to two female clients during office conferences).

Respondent has been disciplined by this Court in the past in unrelated matters. On August 4, 1997, respondent was definitely suspended for six months. *Yarborough, supra.*

Although respondent's misconduct could have potentially created a conflict of interest and affected his ability to exercise independent professional judgment and render candid advice to client, there is no evidence in the record respondent failed to provide adequate representation of client after she rebuffed his advances. Instead, the record indicates respondent was a zealous advocate for client and took all the necessary steps to protect client's interests. Therefore, we publicly reprimand respondent for his inappropriate behavior toward this client and order respondent to pay the costs of this action. See Rule 7(b)(8), RLDE.

**PUBLIC REPRIMAND.**