872 A.2d 693

ATTORNEY GRIEVANCE COMMISSION

v.

Charles J. ZUCKERMAN.

Misc. Docket AG No. 21, Sept. Term, 2004.

Court of Appeals of Maryland.

April 13, 2005.

342

344

Fletcher P. Thompson, Asst. Bar Council (Melvin Hirshman, Bar Counsel for Atty. Grievance Com'n), for petitioner.

Benjamin Lipsitz, Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

The Attorney Grievance Commission of Maryland ("Petitioner" or "Bar Counsel"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a petition for disciplinary or remedial action against respondent, Charles J. Zuckerman, Esquire, on June 11, 2004. The Petition alleged that Zuckerman, who was admitted to the Bar of this Court on June 20, 1974, violated several Maryland Rules of Professional Conduct ("MRPC"), specifically, 1.1 (Competence),[2] 1.3 (Diligence),[3] 1.4 (Communication),[4] 1.5 (Fees),[5] 1.8 (Prohibited Transactions),[6] 1.15 (Safekeeping Property),[7] 5.3 (Responsibili-

---

1. Maryland Rule 16–751(a) provides:

   (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of the Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Rule 1.1 provides:

   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

3. Rule 1.3 provides:

   A lawyer shall act with reasonable diligence and promptness in representing a client.

4. Rule 1.4 provides:

   (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

5. Rule 1.5 provides in relevant part:

   A lawyer's fee shall be reasonable.

6. Rule 1.8 provides in relevant part:

   (e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that: (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

   (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

7. Rule 1.15 provides in relevant part:

ties Regarding Nonlawyer Assistants),[8] 8.4 (Misconduct),[9] Maryland Rule 16–607,[10] and Maryland Code (2000, 2004 Repl.

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

8. Rule 5.3 provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner in the law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

9. Rule 8.4 provides in part:

It is professional misconduct for a lawyer to:

\*        \*        \*

(d) engage in conduct that is prejudicial to the administration of justice....

10. Maryland Rule 16–607 provides in part:

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in

Vol.), Sections 10–304 and 10–306 of the Business Occupations and Professions Article.[11]

In accordance with Maryland Rules 16–752(a) and 16–757(c),[12] we referred the petition to Judge John N. Prevas of the Circuit Court for Baltimore City for an evidentiary hearing and to make findings of fact and conclusions of law. On October 27, 2004, Judge Prevas held a hearing and on January 19, 2005, issued Findings of Fact and Conclusions of Law, in which he found, by clear and convincing evidence, that Zuckerman had violated MRPC 1.1, 1.3, 1.4, 1.15(a) and (b), 5.3(a) and (b), 8.4(d), Maryland Rule 16–607, and Sections 10–304 and 10–306 of the Business Occupations and Professions Article:

---

that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.**

\*　　\*　　\*

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

11. Section 10–304 of the Business Occupations and Professions Article provides in part:

*General Requirement.* -Except as provided in subsection (b) of this section, a lawyer expeditiously shall deposit trust money into an attorney trust account.

Section 10–306 of the Business Occupations and Professions Article provides:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

12. Maryland Rule 16–752(a) states:

(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk is responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing. Maryland Rule 16–757(c) states in pertinent part: " The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law . . . . "

"The Attorney Grievance Commission of Maryland, petitioner, by Bar Counsel, acting pursuant to Maryland Rule 16–751, filed a Petition For Disciplinary or Remedial Action against Charles Zuckerman, respondent. The case was referred to this court, Pursuant to Rules 16–752(a), for hearing pursuant to Rule 16–757(c). The petition charged that the respondent violated Maryland Rule of Professional Conduct 5.3, Responsibilities regarding nonlawyer assistants, 1.3, Diligence, 1.4, Communication, 1.15, Safekeeping Property, and Md. Bus. Occ. & Prof.Code Ann. § 10–304 by failing to deposit trust money in a trust account and § 10–306 by regularly advancing payments to clients, by failing to pay clients, medical providers, and himself funds due to them from personal injury settlements, by failing to notify clients and medical providers that he was holding funds due to them, by having a negative balance in his trust account on March 16, 2000, and by making duplicate payments to himself. Petitioner further alleged that Respondent's conduct was prejudicial to the administration of justice in violation of Rule 8.4(d). Having reviewed and considered the evidence presented at trial on October 27, 2004, the following findings of fact and conclusions of law have been made.

## I. Rule 5.3(a) and (b) (Responsibilities Regarding Non-Lawyer Assistants).

### A. Findings of Fact

"The respondent has been a member of the Maryland Bar since June 20, 1974. He served for about five and a half years as an Assistant State's Attorney in Baltimore City and as an Assistant Attorney General assigned to the Public Service Commission for about a year and a half. For the last twenty-two years the respondent has conducted a private law office in Baltimore City. His cases consisted of a high volume of small personal injury cases (settlements averaging under $10,000) and few family law and criminal law cases as well. He has no history of any disciplinary

sanction or involvement prior to the occurrence which gave rise to the instant case.

"On or about May 7, 2002, respondent hired Shannon Becker as a paralegal. Ms. Becker had previously worked in his employ for six (6) months in 1999 answering the telephone and performing other clerical duties. She left respondent's employ to take what she considered a better job. Karen Kinsely, Ms. Becker's aunt, was respondent's office manager for three years prior to her retirement. While working for the respondent in that capacity, Ms. Kinsely had check-signing authority. In May of 2002, Ms. Becker was rehired by the respondent who requested her job back. She was then 23 or 24 years old. Ms. Kinsely had left the employ of the respondent in Ms. Becker's absence. Ms. Becker was to do generally what she had done before, but was also to handle what her aunt had formerly done which was to handle the accident settlements after a case was settled. This required Ms. Becker to meet with clients, go over the settlement sheet and disburse their money.

"Within one or two days of her hiring, he delegated to her the authority to write checks on his trust account so that he could "concentrate on trying cases." He did so because of the constant need for someone to always be available to sign checks in connection with financial aspects of accident cases whenever such checks were needed. Though he personally had signed each check in the beginning, he later found he could not continue to regularly be available for that purpose, since he did the office's trial work, and it seemed much more efficient to delegate authority to do so to an employee, as he had delegated it to Ms. Kinsely and occasionally other office managers. One of the tasks assigned to Ms. Becker was to go through a group of old files to see if any money was owed to medical providers and, if so, to distribute it, some monies having accumulated during the period of Ms. Kinsely's tenure as office manager. Prior to the discovery of Ms. Becker's defalcations, respondent used a manual system, in which a separate escrow sheet was kept in each

case file on which all trust account transactions were entered. Respondent currently maintains a computerized system controlling his trust account which satisfies the Bar Counsel's office.

"In early May, 2002, Ms. Becker devised a scheme to steal the money in the respondent's trust account. She did so by filling out check stubs made payable to appropriate payees for what appeared to be proper amounts, but the corresponding checks were made out for considerably larger amounts made payable to friends of Ms. Becker's, who cashed the checks and turned over the proceeds to her.

"The statement for the respondent's trust account arrived in his office on or about June 15, 2002. A comparison of the check stubs with the bank statement and investigation into the missing return checks from the statement would have revealed Ms. Becker's theft. However, respondent delegated that task to Stacy Kohler, another of his employees who never reported back to him concerning the assigned task. As a result, Ms. Becker continued to steal from respondent's trust account until mid-July when an anonymous telephone call informed him that Ms. Becker was stealing from him. Upon this information becoming known to him, respondent examined the June bank statement, and detected her theft. He immediately began an intense examination of his trust account which resulted in his discovery that Ms. Becker had been stealing from the trust account. On or about July 15, 2002, respondent contacted the police and took out criminal charges against Ms. Becker. Respondent cooperated fully with police and prosecuting authorities in connection with the charges brought against Ms. Becker, who plead guilty. She was ordered to pay restitution of approximately $137,000 and sentenced to ten (10) years incarceration with all but three years suspended.

## B. Conclusion of Law: Respondent violated Rule 5.3(a) and (b).

"Maryland Rule of Professional Conduct 5.3(a) provides that "a partner in a law firm shall make reasonable efforts

to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer." Rule 5.3(b) provides that "a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer."

"The evidence presented shows that respondent's conduct violated both 5.3(a) and (b). Respondent did not have in place reasonable measures to ensure that his trust account had on deposit all of the funds for clients for whom he was holding money. While respondent gave one of his employees, Stacy Kohler, the task of balancing the checkbook for May 2002, he made no effort to ensure that she accomplished her task. Had the employee reported to respondent after having balanced the checkbook as requested, the theft of Ms. Becker would not have occurred for another month. Further, the act of giving a new employee with no history of reliability was, by itself, a failure to make reasonable efforts to ensure that the firm had in effect measures giving reasonable assurance that the conduct would be compatible with the professional obligations of the lawyer.

"It is also directly inferable from the fact that there was a negative balance in the trust account that the employee Kohler, given the task of balancing the checkbook, was not properly instructed on how to do so. As will be discussed below, funds were regularly advanced to clients and, in one instance, on May 16, 2000, the trust account had a negative balance of which respondent was never made aware. Therefore it is apparent that respondent did not instruct his employees of the proper management of the trust account and inform himself of the status of his employees' efforts to monitor the funds in the account. Had he done so, Ms. Becker's theft would have been discovered on or about June 15, 2002 instead of July 15, 2002, when respondent received the anonymous phone call.

## II. Rule 1.15(a) and Md. Bus. Occ. & Prof.Code Ann. § 10–306 (Safekeeping Property and Misuse of Trust Money)

### A. Findings of Fact

"Ms. Becker's theft prompted the respondent to direct another employee, Rhonda Elkins, to review his records. Since then, Ms. Elkins has spent at least two days per work week on tasks connected with the instant case. The subsequent investigation revealed that between October 2002 and August 2004, the respondent had sixty-two (62) clients that had negative balances at some point or another. A subsequent investigation by John DeBone, a paralegal for the Attorney Grievance Commission, who examined respondent's trust account statements, deposit slips, and deposited items, shows that a total of 109 client's of the respondent had negative balances between 1998 and 2002.

"The analysis also showed that Respondent advanced a total of $311,898.11 to his personal injury clients with checks drawn on his trust account before the funds belonging to those clients were deposited in his trust account. On March 16, 2000, respondent's trust account had a negative balance of $363.13. Mr. DeBone testified that after March 16, 2000, respondent disbursed $21,997.96 on behalf of thirty-four (34) clients, whose funds were supposed to have been on deposit in respondent's trust account at the time the account had a negative balance. Respondent spent the funds belonging to these clients on other matters and did not preserve the funds for his clients.

"In addition, Respondent charged a duplicate fee in connection with the representation of Linwood Smith. On April 23, 1999, respondent deposited $5,500 in his trust account, representing the amount of the settlement. On April 27, 1999, he removed $1,833.00 from his trust account as a fee in the case and an additional $30.00 for expenses. On May 10, 1999, respondent again removed $1,833.00 from the account as a fee and another $30.00 for expenses. As a result of his charging duplicate fees, he invaded the funds of

other clients when he removed his fees from his trust account.

## B. Conclusion of law: Respondent violated Rule 1.15(a) and Md. Bus. Occ. & Prof.Code Ann. § 10–306.

"The conduct described above violates Rule 1.15(a), which provides in part that 'a lawyer shall hold the property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. The funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules.' His conduct also violates BOP § 10–306, which provides that 'a lawyer may not use the trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.'

"Respondent violated the Rule and the Code by writing checks drawn on his trust account to clients who had no funds on deposit in his trust account. In doing so, respondent was giving these clients funds belonging to other clients and thereby failing to keep funds belonging to the other clients in a separate account. In other words, he was giving funds belonging to one client to another. This is a misuse of the money he was holding in trust, which was given to him for the purpose of paying the obligations of the clients whom the settlement checks were written.

"The facts recited above show that this practice was routine in the respondent's office. Time after time, checks were written to clients from respondent's trust account before their settlement checks had been deposited. For example, in the cases of Frances Hubbard and Sally Smith, there was a thirteen day gap between the writing of the check and the deposit of the funds. In the case of a loan to Brittingham, it was a twenty-seven day gap. In the case of McKinley Richardson, it was five months.

"It is further evident from respondent's testimony that he did not view this practice as a matter of concern, even though on one occasion it produced an overdraft. His testimony concerning the overdraft was to the effect that it

was not a matter of great import because the account balance was up to several thousand dollars the same day of the overdraft. It is inferable that respondent's view of the matter was that as long as there were funds available to cover the checks that were coming in on any one day, the advancing of funds to individual clients was not a matter of concern. As the Court made clear in *Attorney Grievance Commission v. Glenn,* 341 Md. 448, 671 A.2d 463, 474, an attorney's trust account must have funds in it to cover the outstanding obligations of the account. Respondent failed to do this and thereby violated Rule 1.15(a) and BOP § 10–306.

### III. Rules 1.1, 1.3, 1.4, 1.15(b) (Competence; Diligence; Communication; Failure to notify or deliver the funds of medical providers and others).

### A. Findings of Fact

"Respondent routinely held money from personal injury settlements for the purpose of paying medical providers. He did not pay the providers promptly after the settlements because he wanted to resolve PIP issues before disbursing the funds to the medical providers. He directed his office employees to put the files which had undisbursed funds aside, to be reviewed periodically. When respondent hired Ms. Becker, money had accumulated in the account for a period of over three years. When respondent reported Ms. Becker's theft to the Attorney Grievance Commission, he believed that she had stolen approximately $115,000.00. On October 7, 2002, respondent wrote to the Commission that the amount taken was approximately $144,000.00. From October 2002 until August 2004, respondent's paralegal, Ms. Elkins, worked approximately two days per week trying to identify the owners of the stolen funds.

"In his deposition in answer to a question about his notification of the medical providers in the case of Elmer Green, respondent testified that the provider would know it had an outstanding bill and that he was handling the case

and that nobody was complaining. Respondent did not know if he had notified the medical providers in Mr. Green's case or not. Respondent received a deposited settlement check on February 28, 2001 and did not pay Medical Service Center nor did he pay Mount Vernon Pharmacy until December 17 and 18, 2002, almost twenty-two (22) months later. Respondent testified that "a lot of times" his office would tell medical providers that they were holding money pending the resolution of PIP issues. Respondent did not know if he had any letters notifying medical providers that he was holding funds belonging to them, nor did he identify any medical providers whom he had told were due money he was holding in trust. Respondent's paralegal did not find any letters to medical providers to the effect that he was holding funds in trust. Respondent did not notify the medical providers to whom he refunded money that he was holding money for them before he mailed them their checks. Respondent began refunding money to clients in December 2002 and continued refunding money to clients through August 2004. Respondent did not notify the clients to whom he mailed the checks that he was holding money for them at any time before he mailed them their checks.

B. **Conclusion of law: Respondent violated Rules 1.1, 1.3, 1.4, 1.15(b) (Competence; Diligence; Communication; Failure to notify or deliver the funds of medical providers and others)**

"Rule 1.15 (b) states:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or the third person except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or the third person any funds or other property that the client. or third person is entitled to receive and, upon request by the client or the third person shall promptly render a full accounting regarding such property.

It is clear from the evidence that respondent for a period of years maintained in his account substantial money belonging to both clients and third parties, namely, his client's medical providers, and did not notify those individuals that he was holding money for them or promptly deliver it to them.

"It was respondent's frequent practice not to disburse all funds when the case was settled but to wait to see if the client's personal injury protection insurance (PIP) paid any of the medical bills. He would put these files aside and periodically review the files to see if PIP had paid the bills. There is no documentary evidence that he told anyone, either clients or medical providers, that he was holding the funds due them. Moreover, he has not identified any client or medical provider whom he advised about the funds he was holding. When Ms. Becker stole the money from his trust account, it took him more than two years to identify some of the owners of the funds and the amounts they were due.

"It is clear, therefore, that respondent was far behind in closing out his files. An examination of Petitioner's Exhibit 6 from his deposition, the computer run from Ms Elkin's work dated August 18,2004, shows that he was paying off medical providers and clients several years after the cases were settled. For example, respondent received the money from Jamel Charmichael's settlement on October 27, 1999 and respondent paid Mr. Charmichael's medical bills on June 26, 2003. Clearly he did not promptly deliver to the clients or medical providers the funds they were due. It is also inferable that he let these matters sit as he handled new cases and did not advise anyone that he held their funds. It is apparent that prior to Ms. Becker's theft of the funds that there had been no activity in these files for several years. If they had been reviewed more frequently and promptly, they would have been closed out with payments made to providers.

"In *AGC v. Stolarz*, 379 Md. 387, 842 A.2d 42 (2004), the Court of Appeals held that an attorney who failed to pay off

a client's debt from personal injury settlement funds in violation of a written assignment in favor of the lender and who failed to notify the lender of his receipt of the settlement check violated Rule 1.15(b) even though he had made an innocent mistake and did not personally profit from the mistake. In this case, respondent made a practice of violating both the prompt notification and prompt delivery requirements of the Rule. Respondent had paid a client or a medical provider in 155 client files as a result of his file review after Ms. Becker's theft. This means that, at the time of the theft, respondent had 155 cases in which he had not promptly disbursed funds to either clients or medical providers in violation of Rule 1.15(b).

"Respondent's failure to pay clients and medical providers promptly is also a violation of Rules 1.1 (Competence), 1.3 Diligence, and 1.4(a) (Communication). Respondent's repeated failures to pay medical providers and clients for periods of years demonstrates a lack of organization and competence to complete all the tasks necessary to protect his clients' interests, namely, payment of all medical bills and the disbursement of all amounts due the client. Respondent's failure to pursue the payment of the medical bills and the disbursement of client funds for a period of years clearly demonstrates a lack of reasonable diligence. Respondent's failure to advise his clients that he had not paid their medical bills or was holding funds for them violates the requirement of Rule 1.4(a) that he keep a client reasonably informed about the status of the client's matter.

## IV. Rules 1.15(a) and 16–607 (Commingling Funds)

### A. Findings of Fact

"In the case of Kristina Mason and Tyrell Wilson, respondent received a $500.00 settlement check on May 3, 1999 and did not remove his $200.00 fee until February 1, 2004. In the case of Monica Flight, respondent received a settlement check of $3,629.00 on February 28, 2001 and did not pay himself a fee of $1,175.00 plus expenses of $25.00 until

February 11, 2004. Petitioner's Exhibit 8. In the case of Alfred Fincher, respondent received a settlement check on May 7, 2001 and did not take his fee until June 22, 2004. Petitioner's Exhibit 8.

**B. Conclusion of Law: Respondent violated Rules 1.15(a) and BOP § 16–607.**

"By failing to remove funds promptly from his trust account, respondent violated both the requirement of Rule 1.15(a) that a client's property be kept separate from the lawyer's property and the requirement of BOP § 16–607(b)(2) that attorney's funds be withdrawn promptly when the attorney becomes entitled to them. In some cases the respondent did not remove his fee from the account for years after it was earned. This failure is a violation of the Rules.

**V. Rule 1.15 and BOP § 10–304 (Failure to deposit trust money)**

**A Findings of Fact**

"Respondent represented individuals in divorce, criminal and bankruptcy cases. In those cases, he charged flat fees, some of which were paid in advance at least in part. Petitioner's Exhibit 8. Respondent deposited these fees in his operating account up until 2003 Petitioner's Exhibit 8, pages 81–84. Respondent's clients would sometimes pay him the balance on or shortly before the day of trial. Petitioner's Exhibit 7, page 21. Those payments were also deposited in his operating account. Respondent now deposits any advance fee payments in his trust account.

"Respondent's testimony and his answers to interrogatories show that he never deposited advance payments of flat fees in his trust account. This conclusion is also inferable from the fact that no advance payments were stolen by Ms. Becker, even though he handled criminal and divorce cases as well as personal injury. As he stated in his answers to interrogatories, respondent would collect the full fee a few

days before the trial and not deposit it in his trust account, even though he had not completed the case.

**B. Conclusion of Law: Respondent violated Rule 1.15 and BOP § 10–304**

"The full flat fee is not earned until all the work associated with the fee is completed. Therefore, the deposit of an advance fee payment in the lawyer's operating account is a violation of the requirement of Rule 1.15 that the lawyer keep the client's property separate from his own and the requirement of BOP § 10–304 that a lawyer deposit trust money, which would include an advance fee payment, in a trust account. *AGC v. McLaughlin*, 372 Md. 467, 813 A.2d 1145 (2002); *ACG v. Blum*, 373 Md. 275, 818 A.2d 219 (2003).

**VI. Violation of Rule 8.4 (Conduct prejudicial to the administration of justice)**

**A. Findings of Fact and Conclusion of Law**

"Respondent's repeated failures to pay either clients or medical providers as he was required to do was conduct prejudicial to the administration of justice. The respondent's inactions both prevented the appropriate resolution of the client's matter and subjected his clients to potential collection actions by their medical providers. His failure to preserve client funds also endangered payment to his clients of funds belonging to them. For these reasons, respondent's conduct was prejudicial to the administration of justice.

*CONCLUSION*

"There are several mitigating factors in this case that must be acknowledged. In addition to the usual stresses encountered in conducting his law practice, for several years immediately prior to the occurrence of Ms. Becker's defalcations the respondent was affected by significant additional stresses. These included the dissolution of his marriage,

the illness, imminency and occurrence of the death of his former wife from cancer, which left respondent with the sole responsibility to care for his pre-teen son. Respondent also continues to suffer from the consequences of injuries he had sustained in an automobile collision sustained many years ago, including recurring surgical procedures. When it came to his attention, Ms. Becker's theft added considerably to respondent's already ample burden of stress. Despite all such stress factors, respondent continued to exert his best efforts in conducting his law practice. Respondent has been under voluntary psychological counseling in an effort to mitigate the effects of stresses to which he has been and to which he is still exposed, and states that he has made significant progress.

"Respondent, who appears to have sustained the greatest (and the only) monetary loss as a result of events here involved, did not improperly misappropriate any monies for himself from the trust account or in any other way profit or benefit from Ms. Becker's defalcations. Immediately upon becoming aware of Ms. Becker's theft, respondent closed his then existing trust account and at once opened a new trust account, in the same bank, to which he properly transferred the remaining proceeds of the former account. At Bar Counsel's request, respondent has from time to time produced thousands of pages of documents and records pertaining to both his former and new trust account. Those records included bank statements containing entries upon entries pertaining to deposits and withdrawals from the trust accounts, from which Bar Counsel's office gleaned and stated in their Petition for Remedial Action that respondent's trust account had a negative balance on May 26, 2000.

"The negative balance did not appear in the statement for May 26, 2000. The existence of the negative balance was repeated several times in papers filed in this case or in discovery material furnished by petitioner until Bar Counsel's office informed respondent's counsel shortly before trial that the date so alleged was wrong and should have been May 16, 2000. This Court permitted the petitioner to

amend the date in the petition to May 16, 2000 at the evidentiary hearing.

"While checks pertaining to settled clients' cases were on some occasions not deposited in respondent's trust account prior to issuance of checks to the clients involved for their respective shares of the proceeds of the settlements, such payments to clients were never made prior to settlement of the case, receipt and execution of all settlement documents and receipt of the settlement funds. Such payments were not advanced payments. Any funds to pay medical providers being held in respondent's trust account at the time of Bar Counsel's investigation of his trust accounts were held for good reasons, although for too long a period of time.

"Interested medical providers were fully aware when cases were settled. Such providers, in order to keep themselves informed in that regard, frequently telephoned respondent's office and were kept informed of the status of the cases in which they were interested. Moreover, no medical provider complained to respondent about any lack of notice that respondent failed to give. Any duplicate payments and failure by respondent to remove earned fees promptly from his trust account were unintentional oversights which were promptly addressed when brought to the respondent's attention. Respondent never made any loans to clients while litigation was pending or contemplated. Moreover, at the evidentiary hearing, petitioner withdrew its charges regarding any alleged loans. Respondent has expended many hours, much effort and considerable funds rectifying the consequences of his employee's defalcations and has taken substantial steps, including installing an accounting system recommended by Bar Counsel to maintain his trust account.

"Despite the mitigating factors described above, there still exist several Rule violations. The evidence shows that respondent was deficient in the management of his trust account for a period of several years. He regularly failed to promptly pay medical providers and paid clients and others with funds belonging to others. Both practices are violations of Rule 1.15, which would have been avoided had respondent

closed the files when settlement occurred. Had he done this, the funds would not have been available for Ms. Becker to steal. Furthermore, the giving of check-writing authority to an unproven, nonlawyer employee within is further evidence of respondent's lax attitude toward his trust account. This attitude is underscored by his lack of interest in the reconciliation of the May account, which, had it been properly performed, would have uncovered Ms. Becker's theft sooner."

Petitioner takes no exceptions to the hearing judge's findings of fact and conclusions of law and recommends indefinite suspension with the right to reapply after two years. On February 3, 2005, Mr. Zuckerman filed several exceptions to the hearing judge's findings.

## STANDARD OF REVIEW

In proceedings involving attorney discipline, this Court has original and complete jurisdiction. *Attorney Grievance Comm'n v. James*, 385 Md. 637, 654, 870 A.2d 229, 239 (2005); *Attorney Grievance Comm'n v. O'Toole*, 379 Md. 595, 604, 843 A.2d 50, 55 (2004). Clear and convincing evidence must support the hearing judge's findings. *Attorney Grievance Comm'n v. Gore*, 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004). As a result, we review the record independently but generally accept the hearing judge's findings of fact unless they are clearly erroneous. *Attorney Grievance Comm'n v. Potter*, 380 Md. 128, 151, 844 A.2d 367, 380–381 (2004). Any conclusions of law made by the hearing judge, such as whether provisions of the MRPC were violated, are subject to our *de novo* review. *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

## DISCUSSION

A. *Zuckerman's Exceptions Regarding the Findings of Fact.*

We have reviewed the record and conclude that Judge Prevas's findings of fact are supported by clear and convincing evidence.

Zuckerman takes exception to several factual findings, each of which we will address and overrule.

*Exception 1:* Respondent excepts to the following findings of fact by the hearing judge: "In May of 2002, Ms. Becker was rehired by the respondent who requested her job back. Since so much of that sentence ... may be susceptible to being interpreted ... that the respondent requested that Ms. Becker, a former employee whose subsequent defalcations gave rise to the instant attorney grievance proceeding, return to his employment, a factual conclusion that is diametrically opposed by the record, which clearly establishes that the course of events which led to Ms. Becker's rehiring was initiated by her written request to have her job back and not by any action on respondent's part."

The trial judge's factual findings do not directly state or impliedly suggest that Mr. Zuckerman sought to rehire Ms. Becker on his own accord without any prompting by Ms. Becker. The findings clearly establish that in May of 2002, Ms. Becker asked to be rehired and that Mr. Zuckerman did rehire her.

This exception is denied.

*Exception 2:* "Respondent excepts to so much of the hearing judge's quoted writing as apparently concludes that the additional interval of theft by Ms. Becker was the 'result' of delay in examination of the June, 2002 bank statement. While the relatively brief additional window of time involved may have afforded Ms. Becker further opportunity to steal, her theft certainly was neither caused by or resulted from that circumstance, but was occasioned by Ms. Becker's criminal activity and intent...."

The trial judge's factual findings do not indicate that Ms. Becker's theft was *caused* by Mr. Zuckerman's failure to timely review the June 2002 bank statement. Rather, Ms. Becker's acts went undetected for a longer period because Mr. Zuckerman did not timely review the June 2002 bank state-

ment, which would have revealed the theft. Indeed, Judge Prevas found:

> The statement for the respondent's trust account arrived in his office on or about June 15, 2002. A comparison of the check stubs with the bank statement and investigation into the missing return checks from the statement would have revealed Ms. Becker's theft. However, respondent delegated that task to Stacy Kohler, another of his employees. who never reported back to him concerning the assigned task. As a result, Ms. Becker continued to steal from respondent's trust account until mid-July when an anonymous telephone call informed him that Ms. Becker was stealing from him. Upon this information becoming known to him, respondent examined the June bank statement, and detected her theft. He immediately began an intense examination of his trust account which resulted in his discovery that Ms. Becker had been stealing from the trust account.

Mr. Zuckerman was responsible for oversight of his trust account, which he abrogated. In his exceptions, Mr. Zuckerman, in fact, admits that "the relatively brief additional window of time involved may have afforded Ms. Becker the further opportunity to steal." Thus, this exception is denied.

> *Exception 3:* Mr. Zuckerman alleges that the hearing judge's factual findings were that there were 109 instances in which clients had negative balances in his trust account. He argues that the record does not show by clear and convincing evidence that any such negative balances existed on his account.

■ First of all, Judge Prevas did not find that there were 109 times where the trust account had a negative balance. Rather, Judge Prevas explicitly found that "A subsequent investigation by John Debone, a paralegal for the Attorney Grievance Commission, who examined respondent's trust account statements, deposit slips, and deposited items, shows that a total of 109 clients of the respondent had negative balances between 1998 and 2002."

The bank statements, admitted in evidence as exhibit 10, indicate that on 109 occasions Mr. Zuckerman paid out more money on behalf of the client than he had on deposit in his trust account for that client, which is also corroborated by the testimony of Ms. Elkins, a paralegal hired by Mr. Zuckerman to review the trust account statements. An analysis of the trust account statements and the corresponding client ledgers, admitted in evidence as exhibit 6, shows that the total amount paid to Mr. Zuckerman's clients in this manner was $311,898.11. We, therefore, conclude that the hearing judge's factual findings are supported by clear and convincing evidence and overrule this exception.

> *Exception 4:* "Respondent vigorously excepts to the judge's characterization ... 'that [Zuckerman] *advanced* a total of $311,898.13 to his personal injury clients with checks drawn on his trust account before the funds belonging to those clients were deposited in his trust account.' "

> *Exception 6:* "Respondent excepts, for the same reasons heretofore stated, to any other instances where the hearing judge in the Findings makes a factual finding that an improper advance had occurred or that respondent did not properly safeguard his clients' funds or other assets, or was not concerned with doing so or otherwise acted improperly with respect to his trust account."

By his own admission, Mr. Zuckerman "readily acknowledges that [he paid clients with funds belonging to others] on occasions, but only where the case involved had been settled, the settlement funds received, appropriate releases executed and delivered and the client involved having been furnished a proper and fully explained settlement sheet." He disputes that in so doing, he advanced "the money to clients from other clients' funds" because of his entitlement theory. Judge Prevas's finding of fact that Mr. Zuckerman "advanced" the money to those clients whose funds were not on deposit is supported by clear and convincing evidence because the clients' funds were only available from deposited funds of other clients, so that the funds paid were "on credit" from the funds of others or "advances." *See* WEBSTER'S NEW COLLEGE

DICTIONARY 17 (1999) (defining "advances" as "[t]he supplying of funds or goods on credit"). Thus, we overrule both exceptions.

> *Exception 5:* Respondent excepts to the following findings of fact by the hearing judge: "On March 16, 2000, [Mr. Zuckerman's] trust account had a negative balance of '$363.13.' The hearing judge then refers to testimony of Mr. Debone, [AGC's investigator], as to the subsequent transactions involving the trust account and concludes that . . . '[Mr. Zuckerman] spent funds belonging to these clients on other matters and did not preserve the funds for his clients.'"

As to the factual finding that the trust account had a negative balance, Mr. Zuckerman argues that the Petitioner initially alleged that the negative balance occurred on May 16, 2000, instead of March 16, 2000, which "misled or at least misdirected [him] in preparation of his defense, because he had a ready response with respect to the date so long relied upon by Petitioner (on which no overdraft or other 'negative balance' [was] disclosed on the pertinent bank statement), only to have that comfortable cushion pulled out from under him by Petitioner's shifting its ground at or shortly before the hearing below."

This exception is disingenuous to the extent that Mr. Zuckerman in argument before this Court and the hearing court below, "acknowledge[d] that a '–363.13' figure appear[ed] on the bank statement for the date to which Petitioner formally shifted at the hearing below. . . ." The record indicates that in its Petition for Disciplinary or Remedial Action, Bar Counsel alleged that a negative balance of Mr. Zuckerman's trust account occurred on May 16, 2000. At the hearing, Judge Prevas allowed Bar Counsel to amend its petition to state the correct date of March 16, 2000, over Mr. Zuckerman's objection. Regardless of the date, Mr. Zuckerman admits that there was a negative balance on his trust account, and bank statements were admitted in evidence as Exhibit 13 during the hearing establishing the date on which the negative balance occurred.

This exception is denied.

Mr. Zuckerman's last factual exception relates to Judge Prevas's "Conclusion" section addressing the mitigating factors in this case. To that end, Mr. Zuckerman argues that the hearing judge's findings of mitigating factors "militate strongly against any conclusion that clear and convincing evidence was produced to establish petitioner's allegations and charges."

■ We note that the facts tending to show mitigation are used to determine the severity of the sanction and not whether the evidence adduced has established a violation of the Rules by clear and convincing evidence. *See Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 484, 671 A.2d 463, 480 (1996). As a result, mitigation factors are not weighed in the balance of whether clear and convincing evidence was adduced to prove the allegations. This exception is denied.

### B. *Exceptions to Conclusions of Law*

Neither Petitioner nor Respondent takes any specific exception to the Conclusions of Law rendered by Judge Prevas; however, Respondent asks this Court to find that he did not violate the Rules on the basis of his Exceptions to the Findings of Fact. Because we already have denied his exceptions, we need not address this issue further.

Judge Prevas found violations of MRPC 1.1, 1.3, 1.4, 1.15(a) and (b), 5.3(a) and (b), 8.4, and Maryland Rule 16–607, and Sections 10–304 and 10–306 of the Business Occupations and Professions Article.

### 1. MRPC 1.1, 1.3, 1.4, 1.15(b)

■ The hearing judge concluded that Mr. Zuckerman's mishandling of the funds in his trust account violated MRPC 1.1, 1.3, 1.4 and 1.15(b). With respect to Rule 1.1 requiring competent representation to a client, Mr. Zuckerman routinely failed to pay clients after settlement for periods of years due to a lack of established procedures to properly maintain his trust account. Once a case settled, Mr. Zuckerman held the

client's settlement money to pay the medical providers, but would not pay them immediately because he wanted to resolve PIP issues before disbursing the funds. He directed his office employees to set aside the files with undisbursed funds and to review those files periodically. At the time that Mr. Zuckerman hired Ms. Becker some settlement monies owed to clients had accumulated in the trust account for longer than three years. In addition, he failed to advise his clients that he was holding their funds and had not paid their medical bills. We have previously held that a respondent's failure to promptly deliver money to a client and to pay third parties demonstrates incompetence in violation of the Rules. *Attorney Grievance Comm'n v. Morehead,* 306 Md. 808, 821, 511 A.2d 520, 527 (1986). Thus, we conclude that Mr. Zuckerman's conduct constitutes a violation of Rule 1.1.

■ Mr. Zuckerman's failure to pay medical bills in a timely manner and to disburse client funds also demonstrates a lack of reasonable diligence in violation of Rule 1.3 and a failure to keep his clients reasonably informed about the status of their cases in violation of Rule 1.4. In essence, Mr. Zuckerman's inability to properly maintain adequate records of the deposits and disbursements of his trust account provides clear and convincing evidence that he violated Rules 1.3 and 1.4. *See Attorney Grievance Comm'n v. Gallagher,* 371 Md. 673, 710, 810 A.2d 996, 1018 (2002).

■ Likewise, Mr. Zuckerman's failure to inform the medical providers and his clients of funds due to them constituted a violation of MRPC 1.15(b), which states:

> "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

We have previously held that an attorney who fails to notify the lender of his receipt of a settlement check and does not pay a client's debts from settlement funds violates Rule 1.15(b). *See Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 399, 400, 842 A.2d 42, 49 (2004).

The evidence adduced at the hearing revealed that Mr. Zuckerman had not properly disbursed funds to either clients or medical providers in fifteen cases. He routinely would not pay the medical providers and clients until several years after the cases were settled. Obviously, he did not deliver the settlement funds when they were due. Moreover, Mr. Zuckerman testified that he did not know whether he had paid all of the outstanding medical provider's bills or if he had sent out any letters notifying medical providers and clients that he was holding funds belonging to them. Although Mr. Zuckerman alleges that he did not purposefully act to violate this Rule, this argument is of no consequence because this Court has explained on several occasions that "an unintentional violation of [Rule 1.15] . . . is still a violation of the attorney's affirmative duties imposed by the rule." *See Stolarz,* 379 Md. at 399, 842 A.2d at 49; *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 20, 741 A.2d 1143, 1154 (1999) (quoting *Glenn,* 341 Md. at 472, 671 A.2d at 475); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 96–97, 706 A.2d 1080, 1085 (1998).

## 2. MRPC 1.15(a), Maryland Rule 16–607, and Md.Code §§ 10–304 and 10–306 of the Business Occupations and Professions Article.

The hearing judge found violations of MRPC 1.15(a) and Maryland Rule 16–607(b)(2) because Mr. Zuckerman failed to remove his earned fees promptly from the trust account, thereby commingling his client's funds with his own. MRPC 1.15(a) states:

> A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules.

Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

Rule 16–607(b)(2) states:

An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

On several occasions, Mr. Zuckerman deposited settlement money belonging to clients into his trust account but failed to promptly remove his fee from the trust account for years after it was earned. For example, Mr. Zuckerman received a $500.00 settlement check on May 3, 1999 and did not remove his fee until February 11, 2004. Likewise, in the year 2001, Mr. Zuckerman deposited money into his trust account from settlement checks, but did not take his fees until one year later. In failing to remove his earned fees promptly from the trust account, Mr. Zuckerman violated both Rule 1.15(a) that a client's property be kept separate from the lawyer's property and Section 16–607(b)(2) of the Business and Professions Article requiring an attorney promptly to withdraw fees once they are earned. *See Attorney Grievance Comm'n v. Sliffman,* 330 Md. 515, 526, 625 A.2d 314, 319 (1993) (holding that a failure to timely transfer earned fees from an attorney trust account involves an impermissible commingling of funds).

The hearing judge also found that Mr. Zuckerman violated Section 10–304 of the Business Occupations and Professions Article because he deposited advance fee payments from his clients into his operating account rather than his trust account, although the fees had not yet been earned. We have previously held that funds given to an attorney in

anticipation of future services qualify as "trust money" under Section 10–301 of the Business Occupations and Professions Article, *see Attorney Grievance Comm'n v. Blum,* 373 Md. 275, 298, 818 A.2d 219, 233 (2003); *McLaughlin,* 372 Md. at 504, 813 A.2d at 1167, which is defined as "a deposit, payment or other money that a person entrusts to a lawyer to hold for the benefit of a client or a beneficial owner." According to Section 10–304 of the Business Occupations and Professions Article, an attorney "expeditiously shall deposit trust money into an attorney trust account." Furthermore, Section 10–306 of the Business Occupations and Professions Article provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

The evidence adduced at the hearing established that Mr. Zuckerman often represented clients in divorce, criminal, and bankruptcy matters. He admitted to this Court, and the hearing court below, that in those cases he would charge clients a flat fee, which was paid in advance of the services rendered, usually on or shortly before the day of trial, and then deposit it into Mr. Zuckerman's operating account. As such, he would deposit the funds into his operating account as if he already had earned them rather than properly placing the funds into his trust account in contravention of the purpose for which they were entrusted. Thus, we agree with the hearing judge's conclusions that such practices violate Sections 10–304 and 10–306 of the Business Occupations and Professions Article, as well as, MRPC 1.15(a). *See Blum,* 373 Md. at 298, 818 A.2d at 233; *McLaughlin,* 372 Md. at 503–04, 813 A.2d at 1166–70.

Zuckerman also committed violations of 1.15(a) and Section 10–306 of the Business Occupations and Professions Article when he disbursed funds to his clients from his trust account before their settlement checks had been deposited into the trust account, thereby providing funds belonging to one client to another. The record establishes that this was a routine practice in Zuckerman's office and on occasion months would lapse before the settlement checks for the clients would be

deposited into the trust account. According to Zuckerman's testimony, he would write the checks so long as there were funds available in the trust account without regard to which client's funds were in the account to cover the checks. We have held that such a failure to maintain the integrity of client funds violates Section 10–306. *See Glenn,* 341 Md. at 481–82, 671 A.2d at 479–80.

### 3. MRPC 5.3(a) and (b)

■ The hearing judge found that Mr. Zuckerman had violated MRPC 5.3(a) and (b) because he did not have reasonable measures in place to ensure that his trust account had all of the funds on deposit for clients to whom he was holding money. Rule 5.3, "Responsibilities Regarding Nonlawyer Assistants," provides in relevant part:

> With respect to a nonlawyer employed or retained by or associated with a lawyer
>
> (a) a partner in the law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. . . .

Respondent delegated the task of balancing the trust account to one of his employees, Stacy Kohler, and her job was to reconcile the bank statements against the check stubs for the trust account. Respondent testified that Stacy Kohler "had not finished [balancing the trust account] because she was doing other things," and that the bank statements usually would come in within two weeks of the date that appeared on them, but that sometimes a month or two would pass without the statements being reviewed. He further admitted that checks were written on funds that had not been deposited in the bank and on March 16, 2000, the trust account had a negative balance of which he was unaware.

We concur with the hearing judge that "respondent did not instruct his employees of the proper management of the trust account and inform himself of the status of his employees' efforts to monitor the funds in the account." Such a failure to oversee his employees' tasks constitutes a violation of MRPC 5.3(a) and (b) because Mr. Zuckerman did not make reasonable efforts to ensure that his employees' conduct complied with his own professional obligations. We have held that "had the respondent exercised a reasonable degree of supervision over [his employee], he might have detected [the employee's] error before any ethical proscriptions had been violated" under Rule 5.3. *Glenn*, 341 Md. at 481, 671 A.2d at 479 (quoting *Attorney Grievance Comm'n v. Dacy*, 313 Md. 1, 5, 542 A.2d 841, 843 (1988)).

### 4. MRPC 8.4(d)

Judge Prevas found that "Respondent's repeated failure to pay either clients or medical providers as he was required to do was conduct prejudicial to the administration of justice" in violation of MRPC 8.4(d). We have found violations of Rule 8.4(d) when the lawyer misappropriated client funds or misused his or her trust account. *See Attorney Grievance Comm'n v. Brown*, 380 Md. 661, 846 A.2d 428 (2004) (misappropriation of client funds); *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 810 A.2d 996 (2002) (misappropriation of client funds); *Attorney Grievance Comm'n v. Santos*, 370 Md. 77, 803 A.2d 505 (2002) (commingling client funds into operating account); *Attorney Grievance Comm'n v. Powell*, 369 Md. 462, 800 A.2d 782 (2002) (misuse of attorney trust account); *Attorney Grievance Comm'n v. McCoy*, 369 Md. 226, 798 A.2d 1132 (2002) (commingling of client funds); *Attorney Grievance Comm'n v. Snyder*, 368 Md. 242, 793 A.2d 515 (2002) (misuse of trust account); *Attorney Grievance Comm'n v. Hollis*, 347 Md. 547, 702 A.2d 223 (1997) (misappropriation of client funds).

In this case, Mr. Zuckerman misused his trust account, commingled client funds in his operating account and commingled client funds in the trust account. We agree with the

hearing judge that such actions constitute conduct that was prejudicial to the administration of justice in violation of Rule 8.4(d).

## SANCTIONS

As we recently stated in *Attorney Grievance Comm'n of Maryland v. Goodman*, 381 Md. 480, 850 A.2d 1157 (2004), the appropriate sanction for a violation of the MRPC depends on the facts and circumstances of each case, including consideration of any mitigating factors. *Id.* at 496, 850 A.2d at 1167; *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 526, 823 A.2d 651, 663 (2003); *Attorney Grievance Comm'n v. McClain*, 373 Md. 196, 211, 817 A.2d 218, 227 (2003). Primarily, we seek "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession." *Awuah II*, 374 Md. at 526, 823 A.2d at 663 (quoting *Blum*, 373 Md. at 303, 818 A.2d at 236). To achieve the goal of protecting the public, we impose a sanction that is "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.* To assist us in determining what would be appropriate, we have reviewed the ABA Standards for Imposing Lawyer Sanctions:

> Along with our own cases as precedent in determining the appropriate sanction, it is helpful for us to refer to the ABA Standards. These standards create an organizational framework that calls for a consideration of four questions: (1) What is the nature of the ethical duty violated; (2) What was the lawyer's mental state; (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct; (4) Are there any aggravating or mitigating circumstances?

*Glenn*, 341 Md. at 484, 671 A.2d at 480 (citing Standard 3.0 of the ABA Standards for Imposing Lawyer Sanctions, *reprinted in Selected Statutes, Rules and Standards on the Legal Profession* 301 (1987)).

Petitioner has recommended that we impose an indefinite suspension with the right to apply for reinstatement no earlier than two years, while Mr. Zuckerman advocates that he should receive a reprimand. We have held that the sanction for misappropriation of client funds is disbarment absent compelling extenuating circumstances justifying a lesser sanction, *see James,* 385 Md. at 665–66, 870 A.2d at 246; *Attorney Grievance v. Sperling,* 380 Md. 180, 191–92, 844 A.2d 397, 404 (2004); *Attorney Grievance Comm'n v. Smith,* 376 Md. 202, 237, 829 A.2d 567, 588 (2003); *Attorney Grievance Comm'n v. Spery,* 371 Md. 560, 568, 810 A.2d 487, 491–92 (2002); *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 410, 773 A.2d 463, 483 (2001); however, "[w]here there is no finding of intentional misappropriation ... and where the misconduct did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction." *Sperling,* 380 Md. at 191–92, 844 A.2d at 404 (quoting *Attorney Grievance Comm'n v. DiCicco,* 369 Md. 662, 687, 802 A.2d 1014, 1028 (2002)); *see also Attorney Grievance Comm'n v. Seiden,* 373 Md. 409, 424–25, 818 A.2d 1108, 1117 (2003); *Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 293, 778 A.2d 390, 398 (2001); *Awuah I,* 346 Md. at 435–36, 697 A.2d at 454. In this regard we have stated, "Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction. This is consistent with the purpose of a disciplinary proceeding...." *Spery,* 371 Md. at 568, 810 A.2d at 491–92 quoting *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997).

We have not previously addressed the appropriate sanction where there was a misappropriation of trust account funds based upon the lawyer's ineffectual accounting procedures and theft of funds by an employee. This Court has issued sanctions ranging from a reprimand to an indefinite suspension with a right to reapply after ninety days when the lawyer's conduct did not amount to an intentional misappropriation. *See Sperling,* 380 Md. at 193, 844 A.2d at 405 (imposing

an indefinite suspension with the right to reapply after ninety days for violations of MRPC 1.15, 8.4 and Maryland Code, Section 10–306 of the Business Occupations and Professions Article where the attorney created an unintentional shortfall in his trust account, none of the clients suffered as a result, but the attorney had a prior disciplinary record and acted with significant delay in bringing the trust account into balance); *Stolarz*, 379 Md. at 405, 842 A.2d at 52–53 (holding that attorney's unintentional failure to notify the creditor bank of his client's receipt of the settlement funds did not warrant imposition of discipline, but rather a dismissal and a warning); *Seiden*, 373 Md. at 425, 818 A.2d at 1117 (imposing a thirty-day suspension with the right to reapply for violations of MRPC 1.1, 1.15(a), 8.4(a), and 8.4(d) because the attorney improperly obtained his fee from his escrow account after depositing settlement funds, but was remorseful, had no previous disciplinary action against him, and the conduct resulted from representing a difficult client); *McClain*, 373 Md. at 212, 817 A.2d at 229 (imposing a thirty-day suspension for violations of MRPC 1.15 and Maryland Code, Section 16–606 of the Business Occupations and Professions Article where the attorney negligently failed to designate his escrow account as an attorney trust account and failed to hold a bidder's deposit from a foreclosure sale, but there was an absence of intentional misconduct, he took a course in escrow account management, and had no prior disciplinary record); *Attorney Grievance Comm'n v. Culver*, 371 Md. 265, 284, 808 A.2d 1251, 1262 (2002) (imposing a thirty-day suspension for violations of MRPC 1.5(c) and Maryland Rule 16–607(b)(2) where the attorney failed to reduce a contingency fee modification to writing and unintentionally commingled funds when he attempted to resolve a fee dispute with clients instead of disbursing his portion of the settlement proceeds to himself); *DiCicco*, 369 Md. at 688, 802 A.2d at 1028 (imposing an indefinite suspension with the right to reapply after ninety days for violations of MRPC 1.15(a) and (c), and 8.4 where the attorney negligently administered his trust account, but there was an absence of fraudulent intent, the attorney had no previous

disciplinary problems and the clients suffered no financial loss); *Adams*, 349 Md. at 98–99, 706 A.2d at 1086 (imposing a thirty-day suspension for violations of MRPC 1.15 and Maryland Rule 16–604 where the lawyer improperly used client funds to pay the client's tax obligations prior to depositing the funds into a trust account, but the conduct was unintentional, he had no prior disciplinary history, and the monies subsequently were paid to the Comptroller).

Several courts from other jurisdictions addressing specific instances of misappropriation of funds due to poor administration of trust funds and theft by an employee have imposed sanctions varying from thirty-day to six-month suspensions. *See In the Matter Marshall*, 331 S.C. 514, 498 S.E.2d 869, 882 (1998) (imposing a six-month suspension for violations resulting from the attorney's delegation of the office's financial affairs to office manager with no supervision, which contributed to manager's embezzlement of client trust fund); *Office of Disciplinary Counsel v. Ball*, 67 Ohio St.3d 401, 618 N.E.2d 159, 162 (1993) (imposing a six-month suspension for attorney's failure to supervise secretary who misappropriated client funds over a ten-year period); *Louisiana State Bar Association v. Keys*, 567 So.2d 588, 593 (La.1990) (imposing a thirty-day suspension for lawyer's negligent supervision of client funds where the lawyer's secretary misappropriated the funds); *In the Matter of Scanlan*, 144 Ariz. 334, 697 P.2d 1084, 1087–88 (1985) (imposing a ninety-day suspension on attorney for failing to exercise minimal care over client trust accounts, and negligently allowing employee to embezzle trust account funds); *In re Privette*, 92 N.M. 32, 582 P.2d 804, 805–06 (1978) (imposing a five-month suspension with provision for a twelve-month probationary period for attorney's negligent handling of client trust funds and failure to supervise employee who embezzled client funds).

■■■ In fashioning a sanction, we are mindful of the fact that mitigating factors should be considered, including

"[A]bsence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional prob-

lems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude towards proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses."

*Glenn,* 341 Md. at 488–89, 671 A.2d at 483. Judge Prevas found several of those to be compelling in the present case.

Mr. Zuckerman has been a member of the Bar of this State since 1974 and has no prior disciplinary record. Once he learned of the theft of the trust account, he notified Bar Counsel immediately and fully cooperated during the investigation by providing full disclosure of his bank statements and records pertaining to his trust account. Moreover, there is no evidence that Mr. Zuckerman acted with an intent to steal money, nor did he benefit personally from the misappropriation of the funds. When he became aware of Ms. Becker's theft, Mr. Zuckerman closed the then existing trust account and transferred the remaining funds to a new account. He also repaid the stolen monies, and none of his clients suffered any financial loss as a result of the theft. In addition, the hearing judge found that Mr. Zuckerman had significant stresses during the time when the theft occurred, namely that he had been recently divorced, his former wife had died leaving him with the sole responsibility of caring for his pre-teen son, and that he had been suffering from injuries due to a car accident. Mr. Zuckerman also voluntarily participated in psychological counseling and had implemented a computerized accounting system to maintain his trust account to Bar Counsel's satisfaction.

These mitigating factors lead us to believe that an appropriate sanction would be an indefinite suspension with the right to reapply after thirty days. *See Seiden,* 373 Md. at 425, 818 A.2d at 1117; *Culver,* 371 Md. at 284, 808 A.2d at 1262.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION.*

HARRELL, J., dissents.

I dissent because I do not believe the sanction imposed in the Majority opinion is commensurate with our treatment of past cases involving misconduct most analogous to that present in this case. In short, the Majority's minimum "sit-out time" for the Respondent is too short in duration.

As a foundational point of reference, it bears repeating that "[t]he purpose of these proceedings is not to punish the lawyer, but any sanction imposed should deter other lawyers from engaging in similar misconduct." *Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 402, 842 A.2d 42, 50 (2004) (citing *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 96, 753 A.2d 17, 38 (2000)). We protect the public by preventing future attorney misconduct only when the sanctions imposed "are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.* (citing *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997)).

The determination of what sanction is commensurate is made often (but not exclusively) by contrasting and comparing the case at hand with prior cases of varying degrees of similarity. My review of more recent attorney grievance cases sharing similar characteristics to the present one indicates that a more stringent sanction is more appropriate than is imposed by the Majority opinion, both to deter generally other lawyers from similar misconduct and to deter specifically an individual lawyer from future transgressions. *Attorney Grievance Comm'n v. DiCicco,* 369 Md. 662, 686, 802 A.2d 1014, 1027 (2002) (quoting *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 98, 797 A.2d 757, 764 (2002) (citations omitted)).

In *Attorney Grievance Comm'n v. Sperling*, 380 Md. 180, 844 A.2d 397 (2004), we ordered an indefinite suspension with a right to re-apply no sooner than ninety days. In *Sperling*, a $42,415.91 shortfall in the attorney's trust account was discovered. We held that Sperling violated Maryland Rules of Professional Conduct (MRPC) 1.15 (Safeguarding property) and 8.4(a) (Misconduct), and § 10–306 of the Business Occupations and Professions Article, Md.Code (1989, 2000 Repl.Vol.), due to his failure to reconcile his trust account. No client complaints instigated the investigation. The misappropriation was deemed unintentional. There was no evidence of any theft of funds by anyone, no evidence of client loss from the shortfall of funds, and no additional errors were discovered after the initial shortfall. *Id.* at 185, 844 A.2d at 400.

Although we took into consideration as mitigation in *Sperling* that the misappropriation was unintentional, the attorney's remorse, and his cooperation with Bar Counsel (to correct the shortfall and accounting problems in his practice), we noted that the shortfall was "quite serious" because it was "in particular one so large." *Id.* at 192, 844 A.2d at 404. In assessing Sperling's sanction, we acknowledged Bar Counsel's warning that Sperling's failure to manage his attorney trust account for several years exposed his clients to risk over that lengthy period. In addition, Bar Counsel argued that the length of time—from May 2002 to January 2003—between when Sperling became aware of the shortfall and when he corrected the balance supported a sanction of indefinite suspension, with a right to reapply no sooner than six months. In settling instead on a ninety day minimum sit-out period, we also rejected Sperling's request for a reprimand, in part because, in a similar set of circumstances, an attorney without a prior disciplinary history in another case received an indefinite suspension with a right to reapply no sooner than ninety days. *Id.* at 192–93, 844 A.2d at 405 (citing *Attorney Grievance Comm'n v. Dicicco*, 369 Md. 662, 802 A.2d 1014 (2002)).

We suspended DiCicco for numerous violations of MRPC 1.15(a) and 8.4(a) after he repeatedly used his attorney escrow

account for his personal interests.[1]  *Attorney Grievance Comm'n v. Dicicco*, 369 Md. 662, 675–76, 802 A.2d 1014, 1027 (2002).  The hearing judge in *DiCicco* noted that there were at least eleven instances of misconduct involving different clients (unexplained low and negative balances from 1997 to 1999) and disbursement checks from DiCicco's attorney trust account that appeared to be unrelated to any of his clients' matters.  *Id.* at 670–71, 802 A.2d at 1018–19.  In ordering his indefinite suspension with a right to seek reinstatement no sooner than ninety days, we considered several mitigating factors.  Among them was a lack of evidence that any client suffered a financial loss from DiCicco's misconduct, which misconduct lacked any fraudulent intent.  *Id.* at 688, 802 A.2d at 1028.  We noted that DiCicco had no record of prior disciplinary problems in his then thirty-eight year membership in the Maryland Bar. *Id.*

At the lesser end of the sanction spectrum from *Sperling* and *DiCicco* is *Attorney Grievance Comm'n v. Adams*, 349 Md. 86, 706 A.2d 1080 (1998).  In *Adams*, we reviewed an attorney's misconduct regarding his attorney operating account and involving but a single client.  We ordered an indefinite suspension with a right to reapply no sooner than thirty days.  Adams represented his client before the Comptroller of the Treasury in negotiating an outstanding tax delinquency.  *Id.* at 91, 706 A.2d at 1082.  After settling on a $2,000.00 payment to the Comptroller, Adams drafted a check from his attorney operating account to pay this amount.  This check was returned for insufficient funds because Adams' client had not given him $2,000.00 to pay the Comptroller and the attorney's operating account had a negative balance at the time the check was drafted.  Adams subsequently received funds from the client, albeit in an amount insufficient to pay fully the negotiated tax bill.  Adams deposited these funds into his operating account and supplemented them with money from sources unrelated to the particular client's representa-

---

1.  We also concluded that he violated MRPC 1.15(c) with regard to one client.

tion. We held that Adams' conduct violated MRPC 1.15(a) and Maryland Rule 16–604.

In arriving at the appropriate sanction, we observed that Adams' handling of the client's money was "sloppy and negligent," but unintentional. *Id.* at 98, 706 A.2d at 1086. We credited as mitigating factors Adams' lack of a prior disciplinary record and that the funds provided by the client ultimately were received by the Comptroller.[2]

Even further along the sanction spectrum is *Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 842 A.2d 42 (2004). In *Stolarz,* we held that an attorney, with no history of past disciplinary infractions before this Bar for twenty-three years, negligently violated MRPC 1.15(b) when he failed to pay one creditor of a client $300.00 out of the client's settlement proceeds.[3] *Id.* at 391–94, 842 A.2d at 44–45. We observed that Stolarz's unintentional negligence (failing to note the assignment in the client's file when he disbursed the settlement proceeds; moreover, the client failed to draw his attention to the missing payment) may be better disposed of, upon remand, by termination of the investigation with a warning to Respondent, thereby deterring future, repeated transgressions. *Id.* at 405, 842 A.2d at 50. We noted that Stolarz made only one mistake (of a relatively small amount) with one client that impacted only one assignee of that client. Stolarz ultimately paid the client's assignee from his own funds and expressed remorse for his error. *Id.*

Against this backdrop, I turn to the appropriate sanction in this case. Zuckerman was first alerted to the gravity of his employee's misappropriation of funds in July of 2002 when he received an anonymous tip. His part-time investigation into the extent of the damage began in October 2002, but was not

---

2. Adams forwarded the $1,900.00 received from the client to the Comptroller by a cashier's check four months and one day after the negotiated settlement occurred. Adams received the client's funds one week after negotiating the tax delinquency settlement.

3. Stolarz's client had assigned $300.00 of any personal injury settlement proceeds as collateral for a loan.

completed until August 2004. The investigation revealed impacts affecting sixty clients. His response to his own unfortunate accounting practices and the theft was considerably slower than Sperling, who took "only" nine months to assess and correct the discrepancy there. Bar Counsel's independent investigation in Zuckerman's case uncovered *109 clients* with negative balances between 1998 and 2002—indicating the widespread scope of the accounting problems from Zuckerman's irresponsible business practices. Many of these clients' accountings had negative balances *before* Ms. Becker defrauded Zuckerman in May 2002. Arguably, if it were not for Ms. Becker's theft, Zuckerman would have been unaware of these negative client balances in his attorney trust account and would have continued his improvident conduct indefinitely.

The sum total of funds at risk throughout this period was $311,898.11, based on checks drawn on his trust account to clients before funds belonging to those clients were deposited in his trust account. This recipe for disaster reached its nadir on 16 March 2000 when he disbursed $21,997.96 on behalf of thirty-four clients, at a time when he had a negative account balance of $363.13. Zuckerman readily admitted that he issued client checks on an "entitlement" basis, rather than waiting for the settlement proceeds to be deposited and completion of the appropriate waivers and accounting statements. Although he periodically did no more than "rob Peter to pay Paul," sometimes for short periods,[4] he routinely advanced money rightfully belonging to other clients to satisfy different clients he felt were "entitled" to their money. Zuckerman's attempts at justifying this ongoing violation of the Maryland Rules of Professional Conduct regarding the safekeeping of client property are unavailing.

Zuckerman, as a matter of routine practice, also did not distribute funds in timely fashion to third party medical providers and thereby violated MRPC 1.15(b). He claims as

---

4. Judge Prevas noted that Zuckerman's routine practice of loaning money from existing client accounts to pay "entitled" clients had resulted in loans ranging from thirteen days to 5 months in duration.

his defense that he did not pay these providers because he was waiting for personal injury protection insurance coverage issues "to resolve." This routine practice left at least $144,000.00 in limbo over a period of at least three years.[5] In order to correct this situation, it took Zuckerman until December 2004 to pay the medical providers their money.[6]

By comparison, in *DiCicco* we sanctioned the attorney for negligent transgressions that impacted perhaps *eleven* clients, without a conclusive holding as to the amount of funds in question, by imposing an indefinite suspension with a right to reapply no sooner than ninety days. Sperling received the identical sanction, notwithstanding the lack of a specific holding as to the number of clients whose funds were misappropriated negligently, where his attorney escrow account had a *$42,415.91* shortfall. In the present case, Zuckerman's unethical accounting practices impacted at least *one hundred fifty-five clients and third parties* and endangered *$311,898.11 of client trust money* and *at least $144,000 owed to third parties.* Unlike *Stolarz* and *Adams*, where the unintentional transgressions involved only one client and in much smaller amounts ($300.00 and $2,000.00, respectively), Zuckerman's unintentional (negligent) misappropriations were of greater impact and scope.[7]

Lastly, I consider the mitigating factors. Like DiCicco, Zuckerman has no history of prior disciplinary proceedings. Yet, having an unblemished record is not a salve that cures all

---

**5.** Ms. Becker stole approximately this amount from his attorney trust account.

**6.** Zuckerman also violated MRPC 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), 5.3(a) & (b) (Responsibilities regarding nonlawyer assistants), and 8.4 (Misconduct). In addition, Zuckerman violated Maryland Rule 16–607 and §§ 10–304 and 10–306 of the Business Occupations and Professions Article. Md.Code (2000, 2004 Repl.Vol.).

**7.** Other cases relied on by the Majority in support of an indefinite suspension with a right to reapply no sooner than thirty days are, upon close examination, not comparable to the facts in this case. They reflect instead a single client benchmark and involved ethical violations of lesser magnitude than those committed by Zuckerman. *Attorney*

ills. It may have greater weight where the transgressions are minor in scope, apparently impact one client or only a few clients, and the misconduct may be characterized fairly as an isolated incident in a long career. *See Stolarz, Adams, supra.* When the misconduct of an attorney impacts potentially hundreds of clients and third parties and significant sums of money, a lesser sanction, even though the attorney has a "spotless" disciplinary record, hardly seems commensurate as a general deterrent against similar conduct by other attorneys. *Dicicco,* 369 Md. at 686, 802 A.2d at 1028. If a sanction is to protect generally the public from future, similar transgressions by lawyers, it must encourage all lawyers, not just those who have prior disciplinary records, to account responsibly for their client trust accounts. An indefinite suspension with a right to reapply no sooner than ninety days is the more appropriate sanction in the present case.

*Grievance Comm'n v. Seiden,* 373 Md. 409, 818 A.2d 1108 (2003) (violation of MRPC 1.1 (Competence), 1.15 (Safekeeping property), 8.4(a) & (d) (Misconduct) involved a single client where the attorney deducted a legal fee of $4,400.00 from estate funds without a Fee Petition to the Orphans Court or consent of the personal representative of the estate); *Attorney Grievance Comm'n v. Culver,* 371 Md. 265, 283–84, 808 A.2d 1251, 1262 (2002) (violation of MRPC 1.5(c) (Fees) and Maryland Rule 16–607(b)(2) involving a single incident with one client and a fee paid to the attorney of $8,714.50).